STATE OF LOUISIANA

VERSUS

ERROL VICTOR, SR.

NO. 15-KA-339

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 10,172 (1), DIVISION "B"
HONORABLE MARY H. BECNEL, JUDGE PRESIDING

May 26, 2016

COURT OF APPEAL
FIFTH CIRCUIT

FILED    MAY 26 2016

Cheryl Quirk Landrieu        CLERK

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and Marc E. Johnson

JEFF LANDRY
    ATTORNEY GENERAL
TERRI R. LACY
HEATHER HOOD
    ASSISTANT ATTORNEYS GENERAL
    Louisiana Department of Justice
    Criminal Division
    Post Office Box 94005
    Baton Rouge, Louisiana 70804-9005
    COUNSEL FOR PLAINTIFF/APPELLEE

ERROL VICTOR, SR.
    #613100
    Louisiana State Penitentiary
    Angola, Louisiana 70712
    COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 3

ASSIGNMENTS OF ERROR ................................................................................ 3

PROCEDURAL HISTORY .................................................................................... 4

FACTS ....................................................................................................................... 7

ASSIGNMENT OF ERROR NUMBER FIVE
*Sufficiency of the evidence* ................................................................................. 24

ASSIGNMENT OF ERROR NUMBER ONE
*First Amendment violation – free exercise of religion* ...................................... 32

ASSIGNMENT OF ERROR NUMBER TWO
*Failure to grant motion for a continuance* ........................................................ 44

ASSIGNMENT OF ERROR NUMBER THREE
*Improper allotment of defendant's case* ............................................................ 52

ASSIGNMENT OF ERROR NUMBER FOUR
*Violation of La. C.Cr.P. art. 673 after motion for recusal filed* ...................... 60

ASSIGNMENT OF ERROR NUMBER SIX
*Denial of defendant's expert witness testimony* ................................................ 63

ASSIGNMENT OF ERROR NUMBER SEVEN
*Violation of right to a speedy trial* .................................................................... 69

ASSIGNMENT OF ERROR NUMBER EIGHT
*Violation of right to confrontation* .................................................................... 76

ASSIGNMENT OF ERROR NUMBER NINE
*Improper composition of the Grand Jury* ........................................................... 78

ASSIGNMENT OF ERROR NUMBER TEN
*State pursued a bad-faith indictment and prosecution against Mr. Errol Victor,
Sr., Ls and Mrs. Tonya Victor, Ls. [sic] The prosecution as a whole was
contrary to medical evidence and gender driven to the detriment of Mr. Errol
Victor [Gender Discriminatory Motives][.]* ...................................................... 79

ASSIGNMENT OF ERROR NUMBER ELEVEN
*Jurisdiction and Status* ...................................................................................... 81

ASSIGNMENT OF ERROR NUMBER TWELVE
*Defendant complains that he was brought before a court which lacked
competent jurisdiction to conduct proceedings against him due to pending
judicial district-wide motion to recuse all judges of the 40th JDC and because
defendant denied co[r]porate status. Defendant avers that these proceedings
have root in vindictive prosecution because the D.A. and his staff were political
and business enemies of defendant and the judicial process was utilize[d] to
execute personal retribution against defendant. The case before the court is a
complete derivative of the twice-dismissed cases: 2008-CR-165; 2010-CR-172,
(66175, 66575, 66576, 46420). An resultant acquittal from abandonment of
legal appeal, res nova violation is claimed by both defendants[.]
[Aba]ndonment of legal appeal, res nova violation is claimed by both
defendants[.]* ...................................................................................................... 82

ERRORS PATENT REVIEW ............................................................................... 87

CONCLUSION ....................................................................................................... 87

## INTRODUCTION

Defendant, Errol Victor, Sr., was convicted by a jury of the second degree murder of his stepson, the minor child M. L. Lloyd, III ("M.L."). On appeal, he argues multiple assignments of error as noted below. After thorough review, we find no reversible error, and affirm defendant's conviction and sentence.

## ASSIGNMENTS OF ERROR[1]

1. The trial court abused its discretion in conducting trial on a Saturday, on defendant's Sabbath day, violating his right to the freedom of exercising his religious beliefs under the First Amendment of the U.S. Constitution.

2. The trial court abused its discretion when it denied defendant's continuance of three days so that his counsel of choice could get familiar with a few issues in the case before enrolling and representing him at trial.

3. Defendant's due process and equal protection rights was [sic] violated when his case was erroneously allotted "*judge shopped*" to another court division and assigned a new case number after a re-indictment, while other re-indicted cases similar situated remained in the original allotted divisions and kept the same case numbers.

4. Defendant was denied his rights of a fair proceeding and due process of law when all the judges of the 40th JDC could not act, because a motion to recuse was filed on all the 40th jdc [sic] judges.

5. The evidence presented in the trial court was insufficient to convict defendant of second degree murder.

6. The trial court abused its discretion by restricting defendant of the right to present an expert witness on his own behalf and restricting evidence showing lack of credibility of witnesses[.]

7. Defendant rights to a Speedy Trial Rights [sic] was violated on State and Federal Levels [sic][.]

8. Defendant was deprived of his Rights to Confront and Cross-examine Coroner during trial.

9. Unconstitutional jury-fixing resulting in discrimination and tainted jury pool requiring disqualification of all jurors (6th, and 14th Amend) [Motion to Quash and contemporaneous objection on/in the trial record].

---

[1] Defendant represents himself on appeal; thus, there are no counseled assignments of error. Defendant's request for oral argument on page 17 of his reply brief does not meet the requirements of Rule 2-11.4 of the Uniform Rules of the Courts of Appeal.

10. State pursued a bad-faith indictment and prosecution against Mr. Errol Victor, Sr., Ls and Mrs. Tonya Victor, Ls. [sic] The prosecution as a whole was contrary to medical evidence and gender driven to the detriment of Mr. Errol Victor [Gender Discriminatory Motives][.]

11. When through negative averment of jurisdiction "Status" and "Jurisdiction" are placed at issue, the burden shifts to the purported party asserting competent jurisdiction.

12. Defendant complains that he was brought before a court which lacked competent jurisdiction to conduct proceedings against him due to pending judicial district-wide motion to recuse all judges of the 40th JDC and because defendant denied co[r]porate status. Defendant avers that these proceedings have root in vindictive prosecution because the D.A. and his staff were political and business enemies of defendant and the judicial process was utilize[d] to execute personal retribution against defendant. The case before the court is a complete derivative of the twice-dismissed cases: 2008-CR-165; 2010-CR-172, (66175, 66575, 66576, 46420). An resultant acquittal from abandonment of legal appeal, res nova violation is claimed by both defendants[.] Abandonment of legal appeal, res nova violation is claimed by both defendants[.]

## PROCEDURAL HISTORY[2]

On April 1, 2008, the eight-year-old boy M.L. Lloyd, III, was brought to the emergency room at River Parishes Hospital in St. John the Baptist Parish, unresponsive, by his mother, co-defendant Tonya Otkins Victor ("Mrs. Victor"),[3] his step-father, defendant Errol Victor, Sr., and his step-brother, Errol Victor, Jr. Emergency room personnel were unable to revive him. During emergency treatment, after M.L.'s clothes were removed, it was discovered that his backside from his neck to his knees was covered in deep bruises. Other injuries were discovered as well: M.L.'s buttocks were both scraped, he had wounds on his forearm, and an injury to his neck.

On April 15, 2008, defendant Errol Victor, Sr., was charged by indictment with one count of first degree murder, in violation of La. R.S. 14:30. On the same

---

[2] Because the majority of the procedural history is not evident in the instant record, it is noted that pursuant to Rule 2-1.14 of the Uniform Rules of the Courts of Appeal (URCA) and *State v. Bradley*, 02-1130 (La. App. 5 Cir. 3/11/03), 844 So.2d 115, 118, defendant's previous writ application, 10-K-892, was reviewed.
[3] Mrs. Victor's appeal, 15-KA-340, proceeds separately from co-defendant Errol Victor, Sr.'s appeal, which is the subject of this opinion.

4

day, co-defendant Mrs. Victor was charged by indictment with accessory after the fact to first degree murder and cruelty to a juvenile.[4] Defendant's case was randomly allotted to Division "A" under case number 2008-CR-165 of the 40th Judicial District Court, Judge Madeline Jasmine presiding. Defendant pled not guilty at arraignment.

On September 22, 2009, both defendant and co-defendant's charges were amended by indictment to second degree murder, while engaged in the perpetration of the crime of cruelty to a juvenile, in violation of La. R.S. 14:30.1(A)(2)(b). Defendant subsequently filed a motion to quash the indictment, which was granted on February 4, 2010. In written reasons, Judge Jasmine determined that the indictment must be quashed because of the "participation of the St. John the Baptist Parish Sheriff's Deputy in the grand jury process as a grand juror while wearing a shirt which openly advertised his employment with an office inherently aligned with the State." After initially filing for reconsideration and/or an appeal of the judgment, on April 6, 2010, the State filed a notice of dismissal without prejudice of all pending charges in case number 2008-CR-165.

Six days later, on April 12, 2010, a newly empaneled grand jury re-indicted defendant and Mrs. Victor with second degree murder, while engaged in the perpetration of the crime of cruelty to a juvenile, in violation of La. R.S. 14:30.1(A)(2)(b). The case was randomly allotted to Division "B," case number 2010-CR-172 of the 40th Judicial District Court, Judge Mary Hotard Becnel presiding. Defendant refused to enter a plea at arraignment; the trial court entered a plea of "not guilty" on his behalf. Defendant filed multiple pre-trial motions, including a Motion to Recuse all of the judges on the 40th Judicial District Court on May 12, 2010, and an "Objection to 'Allotment' of Case to Division 'B' and

---

[4] Errol Victor, Jr. was also indicted, but charges against him were eventually dismissed.

Motion for Transfer to Division of Original Allotment Division 'A,'" on May 17, 2010. All hearings on motions were stayed until the motion to recuse was heard by appointed *ad hoc* Judge Frank Foil on July 1, 2010. Judge Foil denied the motion to recuse. The motion to transfer to the originally allotted division was heard on August 4, 2010, and denied with written reasons on August 18, 2010.

Trial was originally scheduled to begin on August 16, 2011. However, defendants, who were out of jail on bond pending trial, did not appear in court on that day. It was later determined that they had absconded from the State of Louisiana. Defendants were located in Tifton, Georgia, in July 2012, whereupon they were extradited to the State of Louisiana to face the pending charges.

Trial commenced before a twelve-person jury as to both defendants on July 22, 2014. On August 1, 2014, the jury returned a verdict of guilty as charged as to defendant.[5] Prior to sentencing, defendant filed several post-verdict motions, including a motion for post-verdict judgment of acquittal, motion in arrest of judgment, and motion for a new trial, all of which were denied by the trial court on August 25, 2014. On September 15, 2014, defendant was sentenced to life imprisonment at hard labor, without the benefit of parole, probation, or suspension of sentence. The trial court further ordered defendant's sentence to run consecutively with any other sentence defendant may have been serving.[6]

Pursuant to defendant's oral motion for appeal made immediately after sentencing, the trial court granted defendant an appeal on September 24, 2014. Defendant's timely appeal follows.[7]

---

[5] Mrs. Victor was found guilty of the responsive verdict of manslaughter.
[6] Defendant and Mrs. Victor were convicted of bail jumping in reference to their failure to appear in court for their trial in August of 2011 and subsequent absence from the State in violation of their appearance bonds.
[7] It is noted that defendant represents himself on appeal after a finding by the trial court on March 25, 2015 that defendant knowingly, intelligently, and voluntarily waived his right to an appointed appellate attorney.

## FACTS

On April 1, 2008, defendant's eight-year-old stepson, M.L. Lloyd, III, died as a result of injuries consistent with an extensive and severe beating.[8]

Dr. Richard Tracy, an expert in the field of forensic pathology, testified that he performed the autopsy on M.L. on April 2, 2008, the day after M.L. died. Dr. Tracy noted that M.L. had sustained extensive bruising over most of his torso, from the base of his neck to his buttocks, on both thighs, and also along his left forearm. The internal examination of M.L. confirmed that the bruising was deep tissue bruising, nor was there lividity.[9] Over the lumbar and gluteal[10] region, Dr. Tracy also identified impressed abrasions, which in his experience indicated that M.L.'s exposed back and buttocks area had been slid over a rough surface. Based on the appearance of the abrasions, Dr. Tracy concluded that they occurred close in time to the child's death.

During the course of the autopsy, Dr. Tracy also observed distinctive "u-shaped" impressed bruise marks. In one location, the impressed marks displayed a pattern indicative of a doubled-over cord, such as an extension cord or belt. Present on the front of M.L.'s body were also larger more circular patterned bruises and a bruise across the neck area caused by a hard object pressed across M.L.'s windpipe at an angle. In Dr. Tracy's opinion, the bruises were likely two to three days old and were sustained as a result of blunt force trauma.

---

[8] M.L. Lloyd Jr., M.L.'s biological father, testified that he and co-defendant, Tonya Otkins Victor, lived together in Tangipahoa Parish for four years prior to their separation. M.L. was two years old at the time they separated; however, Mr. Lloyd remained in close contact with his son until one day when he arrived at Mrs. Victor's home to pick up his son and discovered that she had moved without his knowledge. Despite attempting to locate her, Mr. Lloyd was unsuccessful and never saw his son again until he was notified four years later by a newspaper reporter of M.L.'s death. Mr. Lloyd testified that he made all of the funeral arrangements and that Mrs. Victor's other four children, Toi Williams, Brandon Williams, Cordell Williams, and Kevin Otkins, all attended the funeral, but that Mrs. Victor did not.

[9] Lividity was explained as the change in skin color from pooling of blood and bodily fluids after death due to gravity.

[10] The gluteal muscles are a group of three muscles which make up the buttocks.

7

Upon internal examination, Dr. Tracy determined that M.L. also suffered from a bruised lung, an injury sustained shortly before his death. He further opined that extensive deep bruising over a large portion of a child's body could cause death. He explained that extensive deep bruising brings about cardiovascular collapse, because the bruising causes a large volume of blood to seep into the tissues, impairing circulation. Dr. Tracy opined that the cause of M.L.'s death could have been either the result of the extensive, confluent deep bruising which caused cardiovascular death, or by asphyxia through the use of a blunt object pressed across M.L.'s windpipe, or both.[11]

Defendant, Mrs. Victor, and Mr. Victor's son, Errol Victor, Jr., brought M.L. to the emergency room, but Mrs. Victor and Errol, Jr. left within minutes, leaving defendant there. Registered nurse Clay Hubble was the first medical professional to come into contact with M.L. Defendant told him that the child had "an accident in the bathroom." According to Nurse Hubble, the child was slumped over and not breathing.

Emergency room physician Dr. Dale Morris confirmed that upon M.L.'s arrival at the hospital, he was limp, unresponsive, had no heartbeat, his pupils were fixed and dilated, and he was cold to the touch. M.L.'s body temperature was 85.2 degrees upon arrival, more than fourteen degrees lower than the average rectal temperature of 99.6 degrees, plus or minus. Dr. Morris and Nurse Hubble noted that they saw no evidence of trauma until M.L.'s clothes were removed, at which point bruises on M.L.'s thighs, back, buttocks, chest, and abdomen were visible, along with the abrasions on his buttocks and lower back.

---

[11] Dr. Tracy's provisional anatomical diagnoses were forwarded to the St. John the Baptist Parish coroner, Dr. Christy Montegut. As coroner, Dr. Montegut issued the death certificate in this case. The first death certificate issued by Dr. Montegut on May 5, 2008, after obtaining Dr. Tracy's provisional anatomical diagnoses, listed the cause of death as asphyxia due to neck compression, and the manner of death was marked as "pending investigation." After obtaining supplemental information, including M.L.'s prior medical records and toxicology reports, Dr. Montegut amended the manner of death to "homicide."

Nurse Hubble attempted to locate defendant to find out what happened to the child, and saw defendant in the parking lot of the hospital speaking with someone whom he believed to be Mrs. Victor, who was seated inside her car. Defendant was eventually escorted into the waiting room of the hospital, and when asked what happened to M.L., defendant told Nurse Hubble, "we had to discipline him" because he was stealing. Although defendant would not respond when asked if he hit M.L., he did state, "I take full responsibility for this."

The registration clerk at the hospital, Nico Savoie, testified that upon M.L.'s arrival at the hospital, Mrs. Victor approached her and stated that her son was in the ambulance bay short of breath. Mrs. Victor then left the hospital with her stepson, Errol, Jr. Ms. Savoie testified that she attempted to obtain M.L.'s name and date of birth, to no avail. Rather, Mrs. Victor told Ms. Savoie that her son had been to the hospital a couple days prior and that he had Medicaid. Ms. Savoie was eventually able to obtain M.L.'s name from defendant, after which she discovered that M.L. had never been treated at River Parishes Hospital as Mrs. Victor had claimed.

M.L. was ultimately pronounced dead twenty minutes after his arrival at the hospital when efforts to resuscitate him failed.[12] Dr. Morris opined that M.L. had probably been dead for a while; he stated that it would have taken over an hour for a person's body temperature to drop to 85.2 degrees.

St. John the Baptist Parish Sheriff's Officer Alkan Traveler, Sr. was dispatched to River Parishes Hospital regarding a juvenile victim later identified as M.L. When Officer Traveler arrived at the hospital in response to the call, he spoke to Dr. Morris and also observed that M.L. had numerous bruises on his

---

[12] On the St. John the Baptist Parish Coroner's Office form, which was required to be filled out by the hospital and sent to the coroner's office, Dr. Morris listed the cause of death as "unknown," but deferred to the coroner's findings after performance of the autopsy.

thighs, buttocks, and lower back. After speaking with Dr. Morris, Officer Traveler approached defendant, who was in the waiting room with his attorney, Tregg Wilson, where he was asked to accompany Officer Traveler to the police station. Captain Kenneth Mitchell of the St. John the Baptist Parish Sheriff's Office, who had also arrived at the hospital pursuant to the dispatch call, advised defendant of his *Miranda*[13] rights and then instructed Officer Traveler not to speak to defendant during his transport to the police station. While transporting defendant to the police station, Officer Traveler overheard defendant speaking to someone whom Officer Traveler believed to be Mrs. Victor on the telephone, advising her not to speak to "the police or anyone else," and to make sure the children did the same. He further stated, "what has happened has happened and [I] cannot change the past. … [Y]ou lost a son today and you're about to lose your husband to prison." According to Officer Traveler, defendant also stated that he would take "full responsibility" for what happened. Once at the police station, Captain Mitchell again advised defendant of his *Miranda* rights in the presence of his attorney. No statements were obtained, and defendant was arrested.

Detective Christie Chauvin, also of the St. John the Baptist Parish Sheriff's Office, likewise arrived at River Parishes Hospital in response to a call made by a hospital employee regarding an unresponsive child "covered in bruises." Upon arrival at the hospital, Detective Chauvin learned from the hospital staff that the child had died and that the mother of the child had left the hospital.[14] Detective Chauvin testified that she was familiar with defendant and knew that he had other children, so she requested that a patrol deputy be dispatched to their home to

---

[13] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[14] Detective Chauvin also reviewed video surveillance footage from the hospital security cameras. On the video, defendant's son, Errol Victor, Jr., is seen carrying M.L.'s limp body through the ambulance bay doors, accompanied by defendant. Mrs. Victor is also seen exiting the driver's side of a Cadillac Escalade and entering the emergency room. On the videos, both defendant and Errol Victor, Jr. then exit the triage room door, where they were met by Mrs. Victor, and proceed to exit the hospital, at which time Mrs. Victor and Errol Victor, Jr. drive away in the Escalade.

10

ensure the safety of the other children. The officers dispatched to defendant's home discovered that no one was present and that Mrs. Victor's vehicle was also not there.

Pursuant to Captain Mitchell's request, Tregg Wilson, defendant's attorney, agreed to contact Mrs. Victor and urge her to return to her residence. Mrs. Victor eventually returned to the residence and was taken to the police station for questioning. The Cadillac Escalade she was driving was searched, revealing over $180,000 in cash, as well as an envelope with attorney Mr. Wilson's phone number on it.[15] Once at the police station, Mrs. Victor was placed under arrest and read her *Miranda* rights.

Captain Mitchell testified that defendant and Mrs. Victor were originally scheduled for trial in this matter on August 16, 2011; however, they did not appear in court for trial. Defendant and Mrs. Victor were eventually located in April of 2012 in Tifton, Georgia, and extradited to Louisiana for trial.

Dr. Scott Benton, an expert in the field of pediatrics and child abuse pediatrics, was retained by the State to evaluate the case and testified at trial. As part of his evaluation, Dr. Benton reviewed the following documentation: the investigative report from the Sheriff's Office; the certificate of death; the autopsy report and associated toxicology report; the River Parishes Hospital emergency record; treatment records from M.L.'s prior treating physician, Dr. Angelo Lobue; relevant photographs; and the testimony provided at certain pretrial hearings conducted in this matter. After his review of the documentation, Dr. Benton opined that M.L. died as a "consequence of injuries that were definitively sustained

---

[15] Mrs. Victor testified that she did not know about the money in the car, but that defendant sometimes carried cash in the car.

11

by physical abuse."[16] When reviewing the autopsy photographs, Dr. Benton found it of particular interest that M.L. had sustained numerous "patterned" bruises over portions of his body. He explained that patterned bruises take the shape or image of the object that caused the bruise. He noted that the bruising that took the shape of a looped pattern could have been from a cord, a belt, or an object that had the ability to be "thin or on edge." Dr. Benton testified that this type of pattern indicates an injury that cannot be self-inflicted. Dr. Benton further noted that the injuries sustained by M.L. involved multiple planes, or surfaces on the body, providing further proof that the injuries were inflicted by someone else. Also, the looped pattern of the bruises indicated to Dr. Benton that M.L. was not clothed at the time they were inflicted.

Dr. Benton testified that the extensive bruising on M.L.'s back that extended all the way down to his buttocks and to the back of his thighs exhibited a pattern injury consisting of linear patterns and abrasions where the skin had been scraped off by the object used to hit M.L. These injuries further confirmed to Dr. Benton that M.L. was not clothed at the time the physical abuse was inflicted. He further testified that the linear pattern seen on M.L.'s backside was indicative of M.L. being struck with a broad paddle or a belt multiple times.

Additionally, Dr. Benton opined that the injuries sustained to M.L.'s forearm were of importance because they indicated that M.L. attempted to block the hits that were inflicted upon him. He further noted that there appeared to be "grab marks" or restraint marks over M.L.'s lower wrist and upper arm. Dr. Benton concluded that in his opinion, strong contributors to M.L.'s death were the severe bruising to his back and torso, and/or asphyxia by compression of the neck. He

---

[16] Dr. Benton testified that in his twenty years of experience reviewing thousands of child death cases, in only a minority of cases has the ultimate conclusion been that the child died from an act or commission of physical abuse.

12

opined that to a reasonable degree of medical certainty, M.L. suffered unjustifiable pain and suffering and died as a result of cruelty.

Lieutenant Pat Baudoin, director of the Child Advocacy Center in St. Charles Parish, testified that she interviewed Toi Williams, Brandon Williams, Cordell Williams, and Kevin Otkins, M.L.'s half-brothers. Their statements were introduced into evidence.

Toi Williams, who was twenty-one years old at the time of trial, testified that at the time his half-brother M.L. died, six years prior to trial, he was fifteen and living with defendant (his stepfather) and his mother, Mrs. Victor, as well as his brothers (Brandon Williams and Cordell Williams) and half-brothers (M.L., Kevin Otkins, Ian Victor, and Jaubert Victor), along with defendant's sons (Errol, Jr., Trent, Fabian, Marcus, Emmanuel, and Chance Victor). Toi said that he and his brothers were home-schooled in a business building defendant owned near their home. Toi recalled that the day before M.L. died, he and his brothers were at the building where they were home-schooled, and defendant had given each of them an ice cream before they left for the day. When they arrived home, defendant told them that he had discovered that someone had stolen an ice cream and he wanted to know who had taken it. According to Toi, a few of the boys were whipped, including M.L., whom defendant whipped with a belt. Later, after M.L. admitted to taking the ice cream, defendant sent the other boys upstairs and continued to beat M.L., "throwing him around," and punching him in the chest. Defendant then proceeded to throw M.L. against the stairs.

Toi testified that defendant told M.L. to wait outside on the porch because he was going to call the police. According to Toi, the police arrived, but he was unaware whether M.L. had spoken with them. M.L. was eventually brought back inside the house and denied dinner that night. Toi recalled that once inside,

13

defendant continued to beat and punch M.L. The next morning, defendant dragged M.L. out of bed and again began to beat M.L. and "sling" him around. Toi stated that he, Errol, Jr., and Emmanuel were then ordered to restrain M.L. Toi testified that he was eventually replaced by another one of defendant's sons because he wasn't "holding him tight enough." Toi recalled that M.L.'s face, wrists, and legs were pinned down while defendant and Fabian (pursuant to defendant's order) beat M.L., who had been stripped down naked, with a belt. Toi testified that the beating lasted for an hour or longer.

During the beating, defendant called Mrs. Victor upstairs to witness the beating where she watched and cried, but did not physically or verbally attempt to stop defendant. Toi stated that he observed bruises on M.L.'s arms and scratches on his backside that were bleeding from the belt used to beat him. He further recalled that defendant put alcohol on the scratches and then continued to beat M.L. According to Toi, the beating stopped for a few moments while defendant and Mrs. Victor went outside to tend to some housework, but when defendant returned inside, he went back upstairs and continued beating M.L. Toi stated that he could hear defendant "throwing M.L. around."

Later, defendant instructed his son Fabian to go to the store to pick up ice and Pedialyte. After Fabian returned from the store, defendant then ordered Brandon to retrieve clothes for M.L. because they were going to take him to the hospital. Toi testified that he observed defendant take his laptop upstairs with him. Toi assumed that defendant was trying to find out what was wrong with M.L. because he stated that M.L. was not breathing. M.L. was eventually taken to the hospital by defendant, Mrs. Victor, and Errol, Jr. Mrs. Victor then returned from the hospital a short time later, at which time she gathered the children and left the house. Toi testified that Mrs. Victor was crying and talking about driving to

14

Tennessee. Toi recalled that while in the car, Mrs. Victor received a phone call that the police were at their house. On their way home, Mrs. Victor instructed her children not to say anything to the police, stating, "You're doing this for M.L."

Toi's twenty-year-old brother, Brandon Williams, corroborated Toi's account of the events surrounding M.L.'s death. Brandon confirmed that the day before M.L. died, they were at defendant's office building where they were home-schooled. He also recalled that before recessing for the day, defendant gave them each an ice cream. When they had returned to the house, defendant stated that an ice cream was stolen and he wanted to know who had taken it. Brandon testified that defendant blamed him and his half-brother M.L. Defendant then whipped both Brandon and M.L. with a belt. According to Brandon, M.L. eventually confessed to taking the ice cream, so defendant instructed his son Trent to whip M.L. because he said "Trent whooped the hardest." He recalled that defendant then ordered M.L. to go outside because he was going to call the police. Later that evening, Brandon was told that he was not allowed to eat dinner, so he went upstairs and could hear M.L. crying while defendant hit him.

The next morning, Brandon recalled that defendant pulled M.L. out of bed and continued to beat him with a belt while Errol, Jr. and Emmanuel held him down by his wrists and legs. Brandon testified that when defendant was done whipping M.L., he sat down and instructed his other sons, either Marcus, Trent, or Fabian, to continue the beating while defendant asked M.L. if he was sorry for what he had done. Brandon stated that the beating went on for approximately two hours. At one point, Brandon recalled his mother being called upstairs by defendant to watch the beating and that she told defendant to stop because she did not want to see it.

15

Once the beating stopped, Brandon testified that M.L. could not move and looked tired. Later, defendant eventually returned to M.L.'s room, where Brandon could hear "a lot of bumping," before he was called upstairs to gather M.L.'s clothes. Brandon testified that when he went upstairs, Mrs. Victor was putting ice on M.L.'s stomach and attempting to get M.L. to say "momma," but he would not respond. According to Brandon, defendant then began to look up M.L.'s medical condition on the computer before determining whether or not to take him to the hospital. Brandon testified that defendant stated he was going to "wait a couple of minutes ... to see if M.L. going to come back," and if not, he would take him to the hospital. Brandon recalled that defendant then went to change his clothes stating, "if I go out, I'm going to go out clean." After waiting approximately five minutes and realizing M.L. was not going to be all right, defendant, Mrs. Victor, and Errol, Jr. took M.L. to the hospital.

Brandon further testified that defendant instructed Mrs. Victor to leave town and drive to Tennessee, but that Mrs. Victor did not want to go, so they returned to the house where she advised her sons not to say anything about what had happened.[17]

Cordell Williams[18] also corroborated Toi and Brandon's testimony as to the events leading up to M.L.'s death. He confirmed that defendant whipped Brandon and M.L. with a belt because he believed one of them had stolen an ice cream sandwich. Cordell further testified that once M.L. admitted to taking the ice cream, defendant whipped him with the assistance of his son Trent on the evening of March 31, 2008. Cordell recalled that M.L. was sent outside for a couple of

---

[17] Brandon testified that when he was first interviewed, he did not tell the truth as to what happened to M.L. because he was instructed not to by Mrs. Victor who stated, "We're doing this for M.L."

[18] At the time of trial, Cordell was eighteen years old.

hours before being brought inside where defendant beat him again with his fists, hitting him in the face, punching him in the chest, and kicking him.

Early the next morning, Cordell observed defendant pull M.L. out of bed and continue the beating. Defendant then called everyone into M.L.'s room where M.L. was on the floor, face down, and defendant was beating him with a belt. Eventually M.L.'s clothes were removed and the beating continued by one of defendant's sons at defendant's instruction. Cordell stated that he observed M.L. bleeding on his backside. He further recalled that defendant stated "I'm going to keep whopping you until I see tears come out your eyes."

Cordell also confirmed that at one point, defendant called Mrs. Victor upstairs to watch. Cordell testified that the beating went on for a long time before defendant went back downstairs. Cordell testified that he was downstairs with his brothers, helping in the garden, when he saw defendant go back upstairs and heard "a lot of bumping," as if defendant was throwing M.L. against the wall. Cordell recalled that after twenty or thirty minutes, defendant instructed Errol, Jr. and his other son Fabian to go to the store to purchase ice and Pedialyte. After they returned from the store, Brandon was instructed to gather clothes for M.L. before M.L. was taken to the hospital. Cordell testified that M.L. was not moving when they carried him to the car. Cordell further confirmed that they were going to drive to Tennessee until his mother changed her mind and decided to go back home, where she instructed her sons to lie about their original plan.

Kevin Otkins confirmed the same accounts as relayed by Toi, Brandon, and Cordell, recalling that M.L. was beaten by defendant with a belt for two days over a stolen ice cream.

Marcus, Emmanuel, and Chance Victor, defendant's biological children, refused to speak during their interviews at the Child Advocacy Center, but testified

17

for the defense at trial, providing a different account of the events from their stepbrothers Toi, Brandon, Cordell, and Kevin.

Marcus Victor testified that he was not present at the building where they were home-schooled the day before M.L.'s death. However, he recalled that later that evening, at their house, defendant had a discussion with his sons about stealing. He noted that Cordell, Brandon, Toi, and Kevin were not cooperating, and that defendant stated that he was going to Tennessee for two weeks and that if their behavior continued, everyone that did not have the last name "Victor" would have to leave when he returned. Marcus testified that there were no "spankings or whippings" on that day. He further recalled that defendant sent M.L. and Brandon to bed that night without dinner. This, however, was contradictory to Marcus's statement provided to the Office of Community Service ("OCS") during which he stated that M.L. was whipped by defendant six times before being sent to bed.[19]

The following morning, Marcus recalled that Mrs. Victor was angry with M.L. for his behavior on the previous day so she "whoop[ed] him bad." Marcus further testified that while this was occurring, defendant was not at home and that neither he, Fabian, nor Errol, Jr. beat M.L. Once defendant returned home, he called a family meeting upstairs, where he informed his stepsons that they had to leave the house. According to Marcus, after the meeting, Cordell, Toi, Brandon, and M.L. remained upstairs and were "fussing with each other." Later, M.L. stated that he was not feeling well, so defendant and Mrs. Victor went upstairs to check on him. Marcus testified that it was at this time that they discovered M.L. was not breathing. According to Marcus, defendant performed CPR on M.L. before driving him to the hospital.

---

[19] Marcus denied giving a statement to OCS wherein he stated that defendant "whipped M.L. and gave him six licks."

18

When questioned as to defendant's disciplinary practices, Marcus testified that defendant would discipline him and his siblings by having them run laps around the house. However, he then admitted that when he provided a statement to OCS, he stated that defendant disciplined him by whipping, which would sometimes involve the use of a belt.[20] Marcus further testified that he never mistreated his stepbrothers and that it was his stepbrothers that would fight amongst themselves.

Fabian Victor, another of defendant's sons, denied restraining M.L. while defendant beat him. He further testified that his father had a "no whipping policy," and that he would discipline his children by having them write down Bible scriptures or run laps. Fabian recalled that on the evening before M.L. died, defendant had M.L. and Brandon stand on the porch and wait for the police as a "scare tactic" for stealing. He further stated that defendant then sent M.L. and Brandon to bed that night without dinner and that neither M.L. nor Brandon were beaten or whipped that day. However, the next morning, Fabian testified that Mrs. Victor called a family meeting and told her sons that they were going to have to live with their biological fathers because they were being disobedient. According to Fabian, Mrs. Victor then whipped M.L. and Brandon with a belt for "what they did the day before." He testified that he saw Mrs. Victor whip M.L. three or four times, but noted that he also did not stay for the entire whipping. Fabian testified that defendant was not at home that morning and that defendant never whipped M.L. He further stated that he never saw any marks or bruises on M.L. and that when Mrs. Victor whipped him, he was wearing his clothes. Fabian testified that

---

[20] On re-direct, Marcus testified that his father had a "no whipping" policy.

after M.L. was taken to the hospital, he and some of his brothers drove to Home Depot when they received a call from Mrs. Victor telling them to return home.[21]

Emmanuel Victor testified that on the day before M.L.'s death, M.L. was not whipped. He testified that on the morning of M.L.'s death, defendant was not at home, and that he saw Mrs. Victor whipping M.L. with a belt for stealing ice cream.[22] Sometime later, Emmanuel recalled that Mrs. Victor called a family meeting where she informed her sons that if they did not behave appropriately, they would be sent to live with their biological fathers. He testified that after the meeting, Toi, Brandon, Cordell, and Kevin stayed upstairs with M.L. According to Emmanuel, noises were heard from upstairs prompting Mrs. Victor to return upstairs to find Cordell beating M.L. He further testified that he was told M.L. suffered from an asthma attack.

Trent Victor testified that on the morning of April 1, 2008, he came out of the bathroom and witnessed Mrs. Victor whipping M.L. with a belt. He further stated that at that time, defendant was not at home. Trent testified that later that morning, after Mrs. Victor conducted a family meeting, he went upstairs and observed Brandon and Cordell fighting M.L. in the bedroom closet.[23] Trent broke up the fight and overheard Brandon and Cordell blaming M.L. for having to be sent away. Trent reported the fighting to Mrs. Victor and then went back upstairs to bring M.L. some food. According to Trent, M.L. did not want to eat and was "breathing funny." At that time, Mrs. Victor instructed one of her sons to call

---

[21] Fabian further testified that when they returned to the house, the police were not present. He stated that the police arrived a short time later. This testimony is at odds with police dispatch logs indicating that officers arrived on the scene to an empty house.

[22] On cross-examination, Emmanuel was confronted with his grand jury testimony during which he testified that he never saw Mrs. Victor strike M.L., but that he heard it.

[23] On June 30, 2009, Trent drafted a handwritten statement detailing the events that took place on the day M.L. died, and in his statement, he did not mention that Brandon fought with M.L. He also provided a recorded statement to the police in July of 2009 and admitted that he did not mention any fighting that had occurred between Brandon and M.L. Trent also admitted that in July of 2009, he provided a statement to the police where he stated that Cordell was "just swinging" at M.L.

defendant.[24] Trent testified that when his father left for the hospital with M.L., he and some of his siblings went to Home Depot. Police officers were at the house upon their return.

Chance Victor testified that on the morning of M.L.'s death, he woke up to "commotion" and was instructed by Mrs. Victor to go downstairs and watch his younger brothers, Ian and Jaubert. Chance testified that defendant was eventually called to come back home because M.L. was not feeling well. Once defendant arrived home, Chance recalled that defendant, Mrs. Victor and Errol, Jr. left to take M.L. to the hospital. Chance further testified that Mrs. Victor admitted to whipping M.L., but that he did not personally observe Mrs. Victor whipping M.L. He noted that Cordell, Brandon, M.L., and Toi had behavioral problems. After the incident, Chance declined to give a statement to OCS.

Kerry Brown testified that he knew defendant because he had represented him in a civil legal matter. He testified that defendant had sought his advice regarding discipline problems he was having with Mrs. Victor's children and alternative schooling options. He recalled that defendant had a tiered discipline structure and that a neighbor complained about one of defendant's disciplinary techniques which involved his children running laps around their home. Mr. Brown further testified that after the Victors were indicted, Mrs. Victor went to his house and told him that "this thing with Errol is all wrong because Errol wasn't even there" and that Mrs. Victor told him she "beat the kids." Mr. Brown also testified that he never personally saw defendant engage in physical violence.

Mrs. Victor took the stand to testify for Mr. Victor after being informed of her Fifth Amendment rights. She testified that when defendant asked her to marry him, she informed him that her sons, Toi, Brandon, Cordell, Kevin, and M.L. had

---

[24] This testimony was contradictory to Trent's aforementioned June 30, 2009 handwritten statement where he noted that defendant came home halfway through the family meeting conducted by Mrs. Victor.

behavioral issues. Mrs. Victor admitted that on the day of M.L.'s death, she spanked Toi, Brandon, and Cordell, and also "chastised"[25] M.L. She further maintained that defendant was not present on the morning of M.L.'s death. She then testified that she had a meeting with her sons that morning during which she told them she was tired of their "behavioral problems." Mrs. Victor testified that after the meeting, everyone went downstairs except for Toi, Cordell, and M.L. While downstairs, Mrs. Victor stated that she heard tussling and fighting going on upstairs. Her son Trent advised her that Cordell was fighting with M.L. in the bedroom closet. Mrs. Victor then went upstairs and asked M.L. what had happened, to which M.L. replied, "Cordell fighting me because he said that I told on him … that he took the ice cream instead of me." After M.L. stated that he was "going to be alright," Mrs. Victor testified that she whipped Cordell.

Sometime later, Mrs. Victor went back upstairs to check on M.L. and witnessed Toi, Brandon, and Cordell fighting M.L. Mrs. Victor admitted, however, that she provided a voluntary written statement on June 26, 2009, in which she made no mention of Brandon, Toi, or Cordell fighting with M.L., nor mentioned Trent having to break up a fight between Cordell and M.L. (The first time Mrs. Victor mentioned Brandon and Toi fighting with M.L. was in a statement dated December 15, 2010.) She stated that the reason they were fighting was because she had previously told them they would have to live with their biological fathers because of their behavioral issues. At one point, Mrs. Victor testified that she and defendant had entertained the idea of giving defendant's sister custody of Cordell because he would bully his younger brothers Ian, Jaubert, and M.L.

---

[25] Throughout her testimony, Mrs. Victor used the words "chastised" and "whooped" interchangeably. In her July 10, 2009 statement, she stated that when she "whooped" M.L., it was with a belt on his buttocks.

Mrs. Victor testified that defendant did not whip, beat, kick, or hit M.L. the day before or on the day of his death. She further testified that on the day of M.L.'s death, M.L. stated that he was tired and could not breathe, so she had one of her sons call defendant and tell him to come home because there was an emergency.[26] When defendant arrived home on April 1, 2008[27] and saw M.L., he believed M.L. was dehydrated, so he sent one of his sons to buy Pedialyte and ice. Mrs. Victor also noted that defendant sought medical advice from a doctor on the internet,[28] and pursuant to the advice received, immediately took M.L. to the hospital.[29] Mrs. Victor stated that she saw bruises on M.L.'s body, but not to the extent shown in the autopsy photographs. Mrs. Victor testified that M.L. was coherent and lucid for a portion of the mile and a half drive to the hospital.

Mrs. Victor explained that she did not remain at the hospital after M.L. was dropped off at the emergency room because she had to bring Errol, Jr. back home.[30] When she returned home, she noticed that some of her children had left, so she called and instructed them to come back to the house because she was going to drive back to the hospital. According to Mrs. Victor, while en route to the hospital, defendant called her and told her that M.L. was dead and that he had been arrested. Mrs. Victor then returned to the house where she was arrested.

Robert Taylor testified that he attended church with defendant's brother, and because he became interested in the Victors' case, a meeting was arranged between himself and Mrs. Victor. During one of the meetings, Mrs. Victor invited Mr.

---

[26] Mrs. Victor testified that M.L. was born with bronchitis, and as a result, was kept in the hospital for a week following his birth. However, M.L. was never treated for asthma after 2003, according to medical records in evidence, a condition Mrs. Victor claimed he suffered from.

[27] In the various statements provided by Mrs. Victor, her testimony differs as to the timing of when her husband arrived home that day.

[28] When the police searched the Victors' home, the laptop computer was not at the residence. Mrs. Victor could not explain why it was missing.

[29] On cross-examination, Mrs. Victor denied telling the social worker, Carliss Johnson, that she came home and found M.L. unresponsive so she took him to the hospital.

[30] The video footage taken from the hospital cameras confirm that Mrs. Victor was at the hospital for two minutes and twenty seconds.

Taylor to her house to record a statement she wanted to make for the public. In the video, Mrs. Victor declared that defendant was not present when she chastised M.L. Mr. Taylor also testified that Mrs. Victor stated that defendant did not approve of her whipping the children.

## ASSIGNMENT OF ERROR NUMBER FIVE[31]

### *Sufficiency of the evidence*

Here, defendant assigns as error the sufficiency of the evidence used to convict him of the second degree murder of his stepson, M.L., while engaged in the perpetration of the crime of cruelty to a juvenile. He claims that the State failed to prove the cause of M.L.'s death. Defendant further contends that the State relied on the fabricated testimonies of Mrs. Victor's sons Toi, Cordell, and Kevin, in support of its position that he repeatedly beat M.L. causing his death. He asserts that their testimonies are in direct conflict with his sons Marcus, Fabian, Emmanuel, Trent, and Chance's testimonies, which established that defendant was not home on the day of M.L.'s death. He further contends that his wife's testimony taking the blame for chastising M.L. also conflicts with the testimony brought forth by the State's witnesses. Defendant concludes that, other than the unreliable testimony of Mrs. Victor's sons, there was no evidence presented that he ever abused M.L. And, he further avers that the medical evidence was consistent with his sons' testimonies that Mrs. Victor spanked M.L. and that M.L. had been seen fighting with Mrs. Victor's other children on the day of his death.

The State argues that the evidence presented was more than sufficient to convict defendant of second degree murder. The State contends that the testimony

---

[31] When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992); *State v. Mayeux*, 94-105 (La. App. 5 Cir. 6/28/94), 639 So.2d 828, 834. If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Therefore, defendant's assigned error concerning the sufficiency of the evidence will be addressed first.

of defendant's stepchildren, which was consistent with the medical testimony of Dr. Benton and Dr. Tracy, led to the reasonable conclusion that defendant was the person who caused M.L.'s injuries resulting in his death. The State maintains that in finding defendant guilty of second degree murder, the jury clearly and rationally rejected defendant's theory of innocence, finding defendant responsible for the death of M.L. beyond a reasonable doubt.

The appropriate standard of review for determining the sufficiency of the evidence was established in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). According to *Jackson*, the standard is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319. Under the *Jackson* standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. *State v. Flores*, 10-651 (La. App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122.

Rather, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*; *Jackson, supra*; *see also State v. Holmes*, 98-490 (La. App. 5 Cir. 3/10/99), 735 So.2d 687, 690; *State v. Ortiz*, 96-1609 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). It is not the function of the appellate court to assess credibility or re-weigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442, 443. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 84, *writ denied*, 03-2745 (La. 2/13/04), 867 So.2d 688.

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Williams*, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Wooten*, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, *writ denied*, 99-2057 (La. 1/14/00), 753 So.2d 208. This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. *Id.* All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Id.*

Defendant was found guilty as charged of second degree murder in violation of La. R.S. 14:30.1(A)(2)(b), which, at the time of the offense,[32] provided that "[s]econd degree murder is the killing of a human being: … [w]hen the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm." This section of La. R.S. 14:30.1 contains the circumstances under which a defendant can be found guilty under the felony murder rule, which dispenses with the necessity of proving *mens rea* accompanying a homicide; the underlying felony supplies the culpable mental state. *State v. Small*, 11-2796 (La. 10/16/12), 100 So.3d 797, 805. The underlying felony that defendant was found to have committed was cruelty to a juvenile, which is defined in La. R.S. 14:93(A)(1) as the "intentional or criminally negligent

---

[32] The Louisiana Supreme Court has consistently held that "the law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer." *State v. Sugasti*, 01-3407 (La. 6/21/02), 820 So.2d 518, 520-22.

mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child."

Thus, in order for the State to prove that defendant was guilty of second degree murder pursuant to La. R.S. 14:30.1(A)(2)(b), it had to establish either: (1) that defendant intentionally mistreated or neglected M.L.; or (2) that defendant was criminally negligent in his mistreatment or neglect of M.L. The term "intentional" within the meaning of this statute requires general criminal intent to cause a child unjustifiable pain and suffering. *State v. Cortez*, 96-859 (La. App. 3 Cir. 12/18/96), 687 So.2d 515, 519 (citing *State v. Morrison*, 582 So.2d 295 (La. App. 1st Cir. 1991)). Mistreatment, as used in this statute, means "abuse." *Cortez*, 96-859, 687 So.2d at 519 (citing *State v. Comeaux*, 319 So.2d 897, 899 (La. 1975)). Moreover, to be criminally negligent in his mistreatment or neglect of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. *State v. Porter*, 99-1722 (La. App. 3 Cir. 5/3/00), 761 So.2d 115, 123; *see also* La. R.S. 14:12.

Generally, the Louisiana Supreme Court has interpreted the felony murder rule to require that a direct act of a defendant or his accomplice cause the death of the victim and has refused to hold persons criminally culpable for setting in motion chains of events that ultimately result in the deaths of others. *State v. Myers*, 99-1849 (La. 4/11/00), 760 So.2d 310; *State v. Kalathakis*, 563 So.2d 228 (La. 1990); *State v. Garner*, 115 So.2d 855 (La. 1959).

In the present case, defendant argues that the evidence was insufficient to convict him of second degree murder while in perpetration of the crime of cruelty

27

to a juvenile because the State failed to prove he had specific intent to kill or cause great bodily harm, failed to prove the cause of M.L.'s death, and because the testimony of the State's witnesses who testified regarding their observance of the crime are untrustworthy, and their testimony was inconsistent with the physical evidence presented. Based on the evidence presented at trial, however, defendant's contentions lack merit.

On April 1, 2008, defendant and Mrs. Victor dropped off an unresponsive eight-year-old boy at the emergency room of River Parishes Hospital. While defendant remained at the hospital, Mrs. Victor quickly left the premises. Upon arrival at the hospital, defendant's stepson, M.L., had no heartbeat, his pupils were fixed and dilated, and he was cold to the touch. Based on his body temperature, emergency room physician Dr. Morris opined that M.L. had likely been dead for "a while." Bruises were also observed all over M.L.'s body, concentrated on his back. In response to a nurse's question to him to determine what had happened to the child, defendant stated that "we had to discipline him" because he was stealing. Defendant further stated to both hospital personnel and a law enforcement official that he would take "full responsibility" for what happened.

Forensic pathologist, Dr. Tracy, performed the autopsy on M.L. He testified regarding the extensive, widespread bruising that covered M.L.'s body, which included circular patterned and distinctive "u-shaped" bruise marks. Dr. Tracy also testified regarding a bruise across M.L.'s neck area, which he opined was caused by a hard object pressed across M.L.'s windpipe. He explained that such extensive deep tissue bruising over a large portion of a child's body could cause death. Thus, Dr. Tracy concluded that the cause of M.L.'s death could have been either the result of the extensive, confluent deep bruising which caused

28

cardiovascular death, or by asphyxia through the use of a blunt object pressed across M.L.'s windpipe, or both. This evidence was uncontroverted.

After reviewing the evidence in this case, Dr. Scott Benton, an expert in the field of pediatrics and child abuse pediatrics, opined that M.L. died as a "consequence of injuries that were definitively sustained by physical abuse." He explained that the patterned bruises observed on M.L.'s body were likely produced by a cord, a belt, or a thin object and that a child could not inflict such injuries upon himself. Dr. Benton further testified regarding the defensive wounds seen on M.L.'s forearm and the restraint marks found on his wrists and upper arms. Dr. Benton concluded that in his opinion, strong contributors to M.L.'s death were the severe bruising to his back and torso and/or asphyxia by compression of the neck. He opined that to a reasonable degree of medical certainty, M.L. suffered unjustifiable pain and suffering and died as a result of cruelty. The purpose of presenting the evidence of the painful nature of the injuries suffered by M.L. and the fact that they were not inflicted accidentally, but instead were intentionally inflicted, was to negate any claim of accidental injury and to prove the elements of cruelty to a juvenile.

Additionally, all four of defendant's stepchildren, Toi, Brandon, Cordell, and Kevin, testified consistently with one another and with the physical evidence in this case. It was their testimony that defendant beat M.L. with a belt over the span of two days after learning that M.L. had taken an ice cream without permission. They recalled the horrific details surrounding the beating, including defendant's instruction to his older sons to restrain M.L. while defendant continually beat M.L. while Mrs. Victor watched, with minimum interference. Toi also recalled the delay in transporting M.L. to the hospital despite the fact that

29

M.L. was not breathing and the instruction given by their mother not to talk to the police.

Defendant's biological children, Marcus, Emmanuel, and Chance, provided a different account of the events leading up to M.L.'s death. They all claimed that their stepmother, Mrs. Victor, whipped M.L. on the day of his death and that their father was not home at the time. They also maintained that M.L.'s clothes were on while he was whipped, which was inconsistent with the physical evidence of the patterned bruising and M.L.'s scraped buttocks. Trent also testified that later that morning, he went upstairs and observed Brandon and Cordell fighting with M.L. Lastly, Mrs. Victor admitted to "chastising" M.L. on the day of his death and maintained that defendant was not present at the time. She further stated that she observed Toi, Brandon, and Cordell fighting M.L. later that day. It is further noted, as well, that Mrs. Victor's various statements successively add more details regarding the fact and extent of the brothers' fighting with M.L., details that were not mentioned in the first statement, as noted above in this opinion.

Defendant seems to argue in brief that the State failed to prove that he had specific intent to kill or cause great bodily harm to M.L. However, as noted above, specific intent is not required to prove second degree murder under the section of La. R.S. 14:30.1 of which defendant was charged. The term "intentional" within the meaning of La. R.S. 14:93 requires general criminal intent to cause a child unjustifiable pain and suffering. The extent of the physical injuries to M.L.'s body caused by repeated beating over a two-day period supports the jury's reasonable conclusion that the perpetrator had the intent to cause M.L. pain and suffering which was unjustified as punishment for the alleged offense of taking an extra ice cream.

The jury, presented with the conflicting testimonies of defendant's stepchildren and his own biological children, as well as their recorded statements, chose to believe the State's witnesses over the defense witnesses. The jury's conclusion regarding the credibility of the witnesses is dependent upon its in-court observation, and when faced with a conflict in testimony, the jury is free to accept or reject, in whole or in part, the testimony of any witness. *See State v. Alexander*, 12-836 (La. App. 5 Cir. 5/23/13), 119 So.3d 698, 702, *writ denied*, 13-1981 (La. 3/21/14), 135 So.3d 614; *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. Moreover, the jury was presented with the testimony of law enforcement officials and hospital personnel who stated that defendant took "full responsibility," noting that M.L. had to be "disciplined." It is the fact-finder who weighs the respective credibility of the witnesses, and this Court will generally not second-guess those determinations. *See State v. Hughes*, 05-0992 (La. 11/29/06), 943 So.2d 1047, 1051. The jury, faced with the physical evidence in this case coupled with the witness testimony presented by both the State and the defense, was within its discretion to believe the State's witnesses regarding the severe and extensive beating committed upon M.L. by defendant and to reject of the defense testimony that defendant was not at home the morning M.L. died.

Defendant also argues that the State failed to present any evidence that M.L. was abused. We find that the evidence of the extensive bruising and other wounds to M.L.'s body was more than sufficient for the jury to conclude that M.L. was physically abused. Furthermore, defendant's claim that the State failed to prove the cause of M.L.'s death is without merit. Dr. Tracy's testimony established that the extensive confluent bruising on M.L.'s body and the other wound to M.L.'s neck could have each caused M.L.'s death, in combination or separately.

31

Accordingly, we find that the evidence, when viewed in the light most favorable to the State, was sufficient to convince a rational trier of fact, beyond a reasonable doubt, that defendant inflicted lethal injuries upon M.L. by his intentional or criminally negligent mistreatment, thus, committing cruelty to a juvenile.[33] This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER ONE

### *First Amendment violation – free exercise of religion*

In this assignment of error, defendant argues that the trial court abused its discretion in conducting trial on a Saturday, a day which defendant claimed was his "Sabbath" day, in violation of his right to free exercise of religion under the First Amendment of the United States Constitution and Article I, § 3 of the Louisiana Constitution of 1974. Defendant contends that because of his religious beliefs and the trial court's refusal to adjourn the trial for that day, he did not participate in the Saturday trial proceedings, a day when the State presented testimony that was prejudicial to his case. As a collateral consequence of his lack of participation, defendant claims that his Sixth and Fourteenth Amendment rights to cross-examine and confront witnesses, to put on a defense, to represent himself, and his right to a fair trial were thus violated. Defendant avers that the State had no compelling interest in holding the trial on Saturday and that the trial judge did nothing to accommodate his right to exercise his religious beliefs. He maintains the court weighed the jurors' personal obligations and concerns over that of his

---

[33] *See State v. Booker*, 02-1269 (La. App. 1 Cir. 2/14/03), 839 So.2d 455, *writ denied*, 03-1145 (La. 10/31/03), 857 So.2d 476, where the defendant's second degree murder conviction was upheld where the immediate cause of the child's death was hypothermia from being left in a cold room. In addition, the child's weakened physical condition, which was due to malnourishment and Battered Child Syndrome, hastened her death, and medical testimony supported the conclusion that the child was beaten severely, possibly rendered unconscious, tied up, and left in the unheated room. *See also* the following cases in which a second degree murder conviction has been upheld based on cruelty to a juvenile, where the defendant committed direct acts of abuse. *State v. Tensley*, 41,726 (La. App. 2 Cir. 4/4/07), 955 So.2d 227, *writ denied*, 07-1185 (La. 12/7/07), 969 So.2d 629 (child beaten to death); *State v. Miller*, 06-0595 (La. App. 3 Cir. 9/27/06), 940 So.2d 864, *writ denied*, 06-2577 (La. 5/11/07), 955 So.2d 1278; *State v. Richthofen*, 01-0500 (La. App. 5 Cir. 11/27/01), 803 So.2d 171, *writ denied*, 02-0206 (La. 1/31/03), 836 So.2d 57.

32

First Amendment right to exercise the freedom to practice his religion by not working on "the Sabbath." Accordingly, defendant prays that his conviction be reversed and his case remanded for a new trial.

The State responds that defendant was previously informed that in an effort to conclude the lengthy trial, as well as in an effort to elicit testimony from an otherwise unavailable witness, the trial would continue into Saturday. According to the State, the trial court took into consideration defendant's objection; however, based on the extraordinary circumstances of the case, the delay it would cause, defendant's inability to substantiate his religious claim, and the fact that defendant did not inform the court of the asserted conflict until the day before the Saturday in question, the State maintains the trial court did not err in holding court on that day.

*Voir dire* selection commenced on Tuesday, July 22, 2014. The trial court stated to all prospective jury panels on July 22 and July 23 that there was a possibility that trial would continue on Saturday, and asked if jurors had any problem with that. Defendant, who was present in court, made no objection on either of those days. It was not until the third day of *voir dire*, Thursday, July 24, 2014,[34] that defendant first objected to holding trial on Saturday, noting that he had heard the judge mention it the day before (July 23), but implied that he had forgotten to object. When the trial court affirmed that it planned to proceed with the trial on Saturday, defendant advised the court that he would be unable to participate due to his religious beliefs, which required the observance of "the Sabbath" as a day of rest. When asked what religion he practiced, defendant stated, "we're non-denominational."

The trial court said that it would conduct further research on the issue before rendering a ruling, noting that the jury put their "lives on hold" for the trial, which

---

[34] The record clearly shows that defendant first objected to Saturday trial on Thursday, July 24, 2014, not Friday, as asserted by the State in brief.

33

included making accommodations to work on Saturday as was cleared with the jury earlier during the week and not objected to by defendant at that time. The State further informed the trial court that one of its crucial out-of-state expert witnesses would be unable to testify after Saturday and would likely be unavailable until after the State had already completed its case.

Testimony in this case began on Friday, July 25, 2014. After testimony concluded, defendant "went on record" and again stated that he would not work on Saturday, his "Sabbath." The judge informed the jury that trial would continue on the next day, Saturday. Defendant filed a written "Objection/Exception/Motion/ Notice to the Court (Sabbath)" on Saturday, July 26, 2014, and argued the motion to the court that morning.[35] In his motion, defendant argued that he could not proceed to trial on Saturday, his Sabbath day, because it was a day of "rest" according to his religious beliefs. Attached to defendant's motion was a "Certificate of Ordination" issued to defendant by the Reverends of the Spiritual Sunlight Baptist Association. The certificate contained no mention of specific tenets, such as the Association's observed Sabbath day. Defendant explained that although he was ordained in this Baptist Association, his current religious membership was "non-denominational." Defendant did not identify a particular church he attended. He averred that he would move for a mistrial if the court proceeded with the trial without his participation in violation of the equal protection clause of the Fourteenth Amendment.

Mrs. Victor also spoke, without objection from defendant, stating:

> There's, there's an understanding that need to be understand and need to be understood to clarify to everything we speaking. Ain't no religion. It's the faith that we have in God. Simple as that. We never said it was religion. We have the right to responds to that.

---

[35] This appears to belie defendant's assertion that he could not work on a Saturday.

We've been ignored ever since we walked in here. She get misses of time that she wants to get and we act like we in the corner. [sic]

Only thing we follow is the Lord, commandments. Thou shall not, that's what it is, God, not our word. So you is disrespecting God in that way? That's the problem with God. If we've got a problem with us, you got a problem -- I don't care. I we can't separate that. [sic]

The same day, after again listening to the previously made arguments of defendant and the State, the trial court ruled that trial would be held on Saturday. In so ruling, the trial court noted that for the first two days of trial, during *voir dire*, defendant had failed to object to going forward on Saturday, despite the matter being specifically addressed with each prospective juror panel in defendant's presence. The trial judge told defendant that he could participate in trial as he wished, that she could not force him, but that the trial would go forward on Saturday.

Defendant again reiterated that he would not participate, and the trial court permitted him to provide the jury with a one sentence explanation as to why he would not be participating in the trial that day. The trial court explained to the jury that it had considered defendant's objections to working on Saturday, and also factored in the inconvenience to the jurors, court personnel, and justice system as a whole, in reaching its decision to move forward with the trial that day.[36]

On appeal, defendant asserts that his claim that the trial court abused its discretion in conducting trial against his protest on the day of his Sabbath is rooted under the Free Exercise Clause of the First Amendment and Article I, § 3 of the Louisiana Constitution of 1974.

"It is a well settled principle of constitutional law that a criminal defendant has the right 'to be present at all stages of the trial where his absence might

---

[36] The court reporter noted in the transcript that on Saturday, July 26, 2014, defendant and co-defendant Mrs. Victor, refused to participate in the trial and "huddled together all day murmuring unintelligibly, Mrs. Victor wearing a napkin on her head the entire day."

frustrate the fairness of the proceedings.'" *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (citing *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)). This right is derived from the Confrontation Clause of the Sixth Amendment to the United States Constitution which states that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him … ." An accused's right to be present in the courtroom at every stage of the trial is one of the most basic of the rights guaranteed by the Confrontation Clause. *State v. Peralta*, 01-149 (La. App. 5 Cir. 1/15/02), 807 So.2d 967, 975, *writ denied*, 02-0541 (La. 1/24/03), 836 So.2d 41 (citing *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)); *see also* La. C.Cr.P. art. 831. This same right is embodied in Article I, § 16 of the Louisiana Constitution of 1974. *Peralta*, 01-149, 807 So.2d at 975 (citing *State v. Shank*, 448 So.2d 654, 657 (La. 1984)). However, the right of confrontation is not absolute. *Peralta*, 01-149, 807 So.2d at 976 (citing *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). It is equally well established that a defendant may waive this right knowingly and voluntarily. *See Diaz v. United States*, 223 U.S. 442, 456-58, 32 S.Ct. 250, 56 L.Ed. 500 (1912). In addition, a waiver may be inferred from a defendant's conduct. *See United States v. Gagnon*, 470 U.S. 522, 528-29, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).

Here, there is no question that defendant's decision not to participate in the Saturday trial proceeding was knowing. The trial judge stated, "we are still going to court today. If you wish to participate, fine. If you don't, you don't have to. I can't force you to. But we are going forward with trial." Thus, defendant knew the consequences of his decision not to participate. Rather, the issue to be determined is whether defendant's choice not to participate was truly "voluntary."

36

In other words, the issue of the voluntariness of a defendant's decision to absent himself from court proceedings due to religious observance must be tied to the question of whether the First Amendment requires a trial judge to accede to the defendant's desire to engage in the particular exercise of his religion. To frame the issue in terms of the Sixth Amendment's "voluntariness" requirement: if a criminal defendant had a First Amendment right to be excused from attending trial on a particular day, a judge's insistence on convening trial on that day would amount to the sort of "coercion" that would render involuntary the defendant's otherwise intentional decision to absent himself.

*Hoyt v. Lewin*, 444 F. Supp.2d 258, 276 (S.D.N.Y. 2006).

Accordingly, we examine whether the Free Exercise Clause of the First Amendment granted defendant the right to "rest" on his Sabbath day rather than participate in his trial.

"The Free Exercise Clause of the First Amendment, which has been applied to the states through the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). A similar provision is contained in Article I, § 8 of the Louisiana Constitution, which provides, "No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof." The significance of the right to the free exercise of religion is not diminished by an individual's status as a defendant in a criminal proceeding. *U.S. v. Fisher*, 571 F.Supp. 1236, 1238 (S.D.N.Y. 1983).

Nonetheless, "not all burdens on religion are unconstitutional. ... The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *Bob Jones University v. United States*, 461 U.S. 574, 603, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (citations omitted). When reconciling a First Amendment right's issue with important government objectives, such as the "efficient, orderly, and fair administration of

37

criminal justice," *Fisher, supra* at 1241, a court must determine (a) whether the state's proffered purpose is sufficiently compelling, and (b) whether the manner chosen to achieve that goal is the least restrictive means for doing so. *See United States v. Lee*, 455 U.S. 252, 257-58, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Gillette v. United States*, 401 U.S. 437, 461-62, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Braunfield v. Brown*, 366 U.S. 599, 603, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Cantewell v. Connecticut*, 310 U.S. 296, 303-04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

No Louisiana cases address whether a court must honor a criminal defendant's request that he not be tried on days which he observes his religious Sabbath. However, federal court cases provide persuasive guiding authority on this issue.

Several courts have applied the aforementioned two-factor test in the context of the State's interest in achieving the efficient and orderly administration of courthouse justice. For example, in *Smilow v. United States*, 465 F.2d 802 (2d Cir. 1972), *vacated and remanded on other grounds*, 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d 215 (1972), the Second Circuit upheld a contempt judgment based on a witness's willful refusal to obey a court order to answer questions posed by a grand jury. The recalcitrant witness asserted that his free exercise rights entitled him to refuse to testify since the act of testifying would contravene a Jewish tenet forbidding him from being an "informer." The Court of Appeals rejected the argument, holding that the witness's First Amendment claim was outweighed by the compelling state interest in having the grand jury hear all of the relevant evidence pertaining to a crime and the narrowly drawn means that were used to achieve that goal. *Id.* at 804-05.

38

A similar analysis was employed in *Fisher*, *supra* at 1237, when the court considered the request of one of eight co-defendants that trial be adjourned on Fridays so that he could attend Muslim services. The court noted that while the request was made two weeks prior to the start of the trial, the defendant had not previously requested Fridays off and had been present on four of the previous eleven Fridays during which pretrial proceedings took place. *Id.* Furthermore, the court noted, there were no objections when it had previously announced a five-day-a-week trial schedule. *Id.* The court denied the defendant's request because there were a large number of co-defendants and because of the possibility that the case could "last weeks, or perhaps months." *Id.* at 1241. Thus, the court found "a legitimate and compelling judicial interest -- one based on both efficiency and fairness to all concerned -- in using all available days of the week for trial of this case." *Id.* Furthermore, the court found that "there is no less restrictive alternative by which it can serve this interest and at the same time accommodate [the defendant's] religious beliefs." *Id.*

In *State v. Pride*, 1 S.W.3d 494 (Mo. App. W.D. 1999), *cert. denied*, 529 U.S. 1004, 120 S.Ct. 1269, 146 L.Ed.2d 219 (2000), the court was informed a few months prior to trial that the defendant was a Seventh Day Adventist. At the beginning of *voir dire*, the court informed the jury panel of the possibility that the trial would need to be held on Saturday. The defendant's counsel reminded the trial judge of the defendant's religious beliefs, noting that his Sabbath was from sundown Friday to sundown Saturday. The court delayed its ruling until it became clear whether the trial might conclude by sundown on Friday.

By Friday afternoon, the court suspected the case would not be completed by sundown that day. The trial judge then asked the defendant to take the stand and testify under oath about his religious beliefs. The defendant testified that he was a

Seventh Day Adventist and that his Sabbath was observed from sundown on Friday until sundown on Saturday and that he could not engage in any secular activities during his Sabbath. He requested that the court not proceed with the trial on Saturday so that he could observe his Sabbath.

The trial judge in *Pride* denied the defendant's motion to adjourn the trial until the following Monday. In making his decision, the judge weighed the defendant's desire not to have trial on Saturday with: (1) the fact that the defendant failed to mention any potential conflict until after the jury had been selected and after the trial judge had already informed the jury of the potential for a Saturday trial; and (2) the fact that the trial judge had a "law day" on Monday, a bench trial on Tuesday, and a jury trial on Wednesday of the following week. *Id.* at 506-507.

On appeal, in *Pride*, the defendant argued that the court's refusal to adjourn the trial until the following week presented him with a "Hobson's choice" in that he could either: (1) exercise his right to observe his Sabbath by staying at home; or (2) appear in court on Saturday to exercise his right to be present at his trial. Ultimately, he appeared in court on Saturday, against his religious beliefs, contending that it was necessary to his defense. Thus, he argued that the requirement that he violate his beliefs by appearing at trial was constitutional error which entitled him to a new trial.

In finding that the trial court did not abuse its discretion in failing to adjourn court on Saturday, the *Pride* court found that the trial judge carefully considered the defendant's concerns and determined nonetheless to hold court on Saturday because of the defendant's delay in raising the issue and because it was the only time he could hold court in light of his other scheduled cases. The appellate court noted the trial court could have reached a different conclusion by resetting his

40

schedule for the following week, yet concluded that the failure to do so did not constitute an abuse of the trial court's discretion.[37]

A number of cases have also denied a defendant's request for adjournment on the basis of religious observances based on the posture of the trial. For example, in *Hoyt v. Lewin, supra*, the trial court declined to interrupt ongoing jury deliberations until the following Monday so that the defendant, a practicing Muslim, could "observe his religious holiday and his First Amendment right." In denying the defendant's request, the trial court reasoned that a three-day delay would exacerbate the possibility of a retrial if something were to happen to one of the jurors. The court also noted that the adjournment would cause the court to "lose control" of the jury, and "the State's interest in getting a verdict surpassed the defendant's right to be present at his verdict." The *Lewin* Court agreed, finding there to be a compelling government interest in declining to interrupt jury deliberations, particularly given the approach of a weekend, and further reasoning that the need to continue deliberations "outweighed the very precious and obviously sensitive right of a person to exercise his or her religion." *See also People v. Johnson*, 295 A.D.2d 106 (1st Dept. 2002), *appeal denied*, 98 N.Y.2d 769 (2002), where the court upheld the denial of an adjournment request where the defendant did not make the request until Friday morning. The apparently un-sequestered jury was deliberating, and the court foresaw problems with postponing continued deliberations to Monday. The court concluded that "a three-day adjournment would have substantially jeopardized the State's compelling interest in insuring a fair trial for both defendant and the People." *Id.* at 107.

---

[37] While *Pride* appears to be directly on point to the issue presented in the instant matter, it is important to note that the less restrictive standard applied by the Missouri Court of Appeal followed the United States Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which held that "states need not show a compelling state interest in order to apply neutral, generally applicable laws to religious practices." *Boerne*, however, was superseded by statute and supplanted by the mandates of the Religious Land Use and Institutionalized Persons Act of 2000, codified at 42 U.S.C. §§ 2000cc, *et seq.*, which employs the "compelling state interest" standard.

41

In the present case, the record reflects that the trial judge carefully considered defendant's concerns as well as his delay in raising this issue, including his failure to object when the prospective jury was advised numerous times of the possibility that they would be required to work on Saturday, his lack of a specific religious affiliation or particular church membership, the unavailability of the State's key expert witness the following week, and "the justice system as a whole," in denying defendant's request not to hold trial on Saturday.

First, the trial court made specific mention of the fact that sixteen jurors had committed to working on Saturday without objection.[38] It was not until Thursday, the third day of *voir dire*, that defendant first raised this issue. As in *Fisher*, *Pride*, and *Lewin*, *supra*, although factual differences do exist, a delay in raising the request that court be adjourned on certain days for religious reasons weighed in favor of a legitimate and compelling judicial interest in going forward with trial based on efficiency and fairness.

Moreover, while it has been held improper to inquire into the worthiness of a defendant's religious beliefs to determine whether the First Amendment affords them protection, the court may inquire, as a threshold issue, into the sincerity of the defendant's religious beliefs. *See Kaplan v Hess*, 694 F.2d 847, 851 (U.S. App. D.C. 1982); *Fisher*, *supra* at 1240. *See also People v. Johnson*, 143 A.D.2d 847 (N.Y.S.2d 1988), where the trial court properly resolved the defendant's First Amendment claim upon the evidence that the defendant's observance of the Muslim Sabbath was inconsistent and reflected a lack of sincerity in his belief that Friday is a holy day when the defendant stated he was "studying to be a Muslim."

---

[38] Defendant disagreed with the trial judge's assertion. However, on the first day of *voir dire*, July 22, 2014, the trial court advised the prospective jurors that they would "probably work on Saturdays also." Defendant failed to object at that time. The trial court also advised the new panel of prospective jurors on the second day of *voir dire*, July 23, 2014, that she would like to work on Saturday, but would entertain working late on Friday as well. Again, defendant failed to object. On the same day, after another new panel of prospective jurors was sworn in, the trial court again advised the new panel that they may be "working on Saturdays," and asked them whether this imposition would cause them to be unable to serve on the jury. Again, defendant failed to object.

"Thus the [First] Amendment embraces two concepts, freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell v. Connecticut*, 310 U.S. 296, 303-304; *United States v. Ballard*, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148, 1153-54 (1944). In the present case, although the trial court did not specifically find that defendant's beliefs were insincere, the trial court did take note that when asked what religion defendant followed, he stated that it was "non-denominational," despite being ordained under a Baptist association. He stated that his religion dated back four thousand years and that the Sabbath was always required to be kept holy as a day of rest.

Indeed, the failure of defendant to object for the first two days of trial to working on Saturday,[39] and his failure to substantiate his claim by identifying a particular religion, sect, or tradition or a particular church at which he worshipped, rendered the particular claim self-serving and did not negate the possibility that it was made in an attempt to obstruct or delay the orderly progress of trial. The record is replete with numerous statements by defendant, made in pre-trial proceedings, that the matter would not go to trial. The record is also replete with other actions by defendant that caused delays in setting the matter for trial, as are noted below.

Lastly, the trial court and the State's interest in achieving the efficient and orderly administration of courthouse justice was considered. Sixteen jurors were empaneled to hear the Victors' case regarding a crime that occurred six years earlier in 2008, and were met with many obstacles set in place primarily by defendant until trial eventually commenced in 2014. Moreover, a large concern, as posed by the State, regarding the adjournment of trial until the following week, was the unavailability of the State's key out-of-state expert witness.

---

[39] The record as a whole reflects that defendant, throughout these proceedings, freely objected to many things at most hearings, which renders his assertion that he forgot to object on July 23, 2014 suspect.

43

Accordingly, under the specific facts and circumstances of this case, and considering defendant's conduct in this case as a whole, we find that the trial judge properly weighed defendant's right to act pursuant to his religious belief with the State's compelling interest in the orderly progression of trial and properly found that there was a legitimate compelling judicial interest, based on efficiency and fairness to all, including defendant, in declining to adjourn trial on Saturday. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

### *Failure to grant motion for a continuance*

In this assignment of error, defendant contends that the failure of the trial court to grant him a continuance so that counsel of his choice could enroll in the case was prejudicial and constituted an abuse of discretion. Specifically, defendant asserts that although he chose to represent himself at trial, he had decided that he wanted the representation of counsel before trial commenced on July 22, 2014. He alleges he was forced to proceed to trial without representation when his motion for a continuance, based upon his new counsel's need to familiarize himself with the case, was denied. Accordingly, defendant concludes that the trial court abused its discretion by allowing him to proceed to trial *pro se* when he had an available opportunity to retain a qualified attorney to defend his case.

The State responds that during the life of this case, defendant hired and terminated numerous attorneys. It asserts that defendant's tactics regarding his representation were dilatory, continually wavering between private representation and self-representation in an attempt to avoid trial. Accordingly, because the trial court provided defendant with ample opportunity for representation since the origination of this case, the State maintains the trial court did not abuse its

44

discretion when it denied defendant's request for a continuance so counsel of his choosing could enroll on the morning of trial.

The procedural timeline provided, *infra*, sets forth the enrollment and termination of defendant's attorneys after the quashing of the amended indictment and the grand jury's re-indictment of defendant for second degree murder on April 12, 2010, the charge for which defendant was tried and convicted. Throughout this case, defendant has gone back and forth numerous times between self-representation and changes of counsel.[40]

| | |
|---|---|
| April 12, 2010: | Defendant indicted on charges of second degree murder. |
| May 6, 2010: | Court orders the appointment of public defender Richard Stricks. |
| June 15, 2010: | Defendant files a *pro se* motion to enroll attorney Morris Reed as counsel of record. |
| June 18, 2010: | Attorney Morris Reed files motion to enroll as counsel of record for purposes of defendant's motion to recuse, which is granted by the trial court on June 21, 2010. |
| June 20, 2010: | Defendant files a *pro se* motion to refuse the appointment of the public defender's office, alleging violations to his Sixth and Fourteenth Amendment rights. |
| October 14, 2010: | Defendant files a *pro se* motion to terminate the representation of the public defender's office |

---

[40] This timeline does not include the procedural history of the case 2008-CR-165 from 2008 when defendant was originally charged with first degree murder. The information regarding defendant's enrollment of various attorneys beginning in 2008 is not contained in this record. However, at an enrollment hearing in this case held on April 18, 2011, the trial judge laid out the procedural history with regards to attorney enrollment from the inception of prosecution in 2008. Specifically, the trial court noted that on April 3, 2008, Tregg Wilson represented defendant; on April 22, 2008, Fontella Fountain appeared with Mr. Wilson to represent defendant; on May 27, 2008, "Miss Baker" enrolled as counsel for defendant; on November 18, 2009, Ernest Jones was enrolled as counsel of record; on March 17, 2009, Mr. Jones withdrew as counsel of record and "Mr. Spears" enrolled; on March 30, 2009, Darryl Hickman enrolled to represent defendant; on April 21, 2009, three Florida attorneys, "Mr. Cohen, Mr. Kohnsari, and Mr. Rice", enrolled as defendant's counsel of record; on September 22, 2009, Nghana Gauff represented defendant; on November 23, 2009, Lionel Burns enrolled as counsel of record for defendant; on March 23, 2010, Mr. Burns filed a motion to withdraw which was denied; on March 29, 2010, defendant objected to Mr. Burns' representation at which time defendant's request to represent himself was granted; on May 13, 2010, the court appointed backup counsel for defendants; on February 1, 2011, Mona Joseph was appointed to assist defendant in his representation; however, defendant stated that he had retained Katherine Wilson as his attorney; and on March 4, 2011, defendant terminated Ms. Wilson as counsel of record, choosing again to represent himself. Thus, prior to the filing of the new indictment under which defendant was prosecuted and convicted, defendant had changed counsel thirteen times.

45

| | |
|---|---|
| | alleging ineffective assistance of counsel and requesting to proceed to trial *pro se*. |
| October 18, 2010: | Defendant files a *pro se* "Objection to 'Pro Se Hearing,'" alleging that his right to self-representation has been repeatedly violated over the course of several hearings having been held without a "*pro se* hearing" but rather with the aid of his unwanted public defender. |
| | A hearing is held after which the trial court determines that defendant is competent to waive his right to counsel, and that he knowingly, intelligently, freely, and voluntarily waived his right, thus, permitting defendant to represent himself in this case. The trial court further appoints attorney Ed Greenlee with the Public Defender's Office to assist defendant as "standby counsel" should defendant require assistance. |
| November 15, 2010: | Defendant files a *pro se* motion to enroll attorney James "Jake" Lemmon, for purpose of a pending bond hearing. Defendant's motion is granted on the same day by the trial court. |
| November 17, 2010: | Defendant files a *pro se* motion to relieve the services of Jake Lemmon as assistant counsel, requesting that he remain "*pro se*" in all proceedings. |
| | Defendant files a *pro se* motion for substitution of assistance of counsel, requesting that he proceed completely on his own. This request is denied by the trial court, and pursuant to a writ taken by defendant to this Court, defendant's writ application is denied as it related to the trial court's appointment of the public defender as an advisor and standby counsel. |
| April 18, 2011: | Lionel Burns files a motion on behalf of defendant to serve as counsel of record in this matter, which is granted by the trial court, after a hearing, the same day. |
| July 8, 2011: | Lionel Burns files a motion to withdraw as counsel of record, which is denied by the trial court the same day. |
| August 8, 2011: | Lionel Burns files a second motion to withdraw as counsel of record based on defendant's termination of his services. This request is denied by the trial judge, and it is noted that counsel and defendant |

46

|  | must be prepared to proceed to trial scheduled to commence the following week.[41] |
|---|---|
| August 11 and 12, 2011: | Attorney Alicia Johnson Butler files a motion to enroll as counsel of record on defendant's behalf. |
| August 16, 2011: | Trial set to commence on this date. However, while out on bond, the Victors failed to appear and were not located until April of 2012 in Georgia. After fighting extradition, the Victors were returned to Louisiana in July of 2012. |
| December 5, 2012 | Minute entry indicates defendant was present in court for a motion to terminate appointment of counsel Lionel Burns. The court granted Mr. Burns' motion to withdraw from the case and additionally questioned defendant that if she were to ask him the same questions about self-representation would his answers be the same. Defendant stated "yes" and that he did not want the public defender's office to represent him as standby or assistant counsel. |
| July 17, 2013: | Motion to enroll as counsel of record filed by Stephen A. Yazbeck. |
| January 21, 2014: | A scheduling order is established by the court, setting the trial deadlines, including the trial date of July 22, 2014. |
|  | Stephen Yazbeck files a motion to withdraw as counsel of record, which is granted by the trial court the same day. Defendant is handed a copy of the "self representation colloquy" that is substantially similar to the one from the October 18, 2010 hearing, and which was filed into the record. Defendant also refuses appointment of the public defender's office to represent him. Thus, the trial court determines that after having had "several hearings regarding these defendants and multiple changes of counsel … defendants have substantial knowledge and understanding of court proceedings. *The court will allow defendants to represent themselves at this time with the understanding that should they wish to retain counsel, it must be done in a timely manner, not to interfere with the trial schedule issued by the court, and the retention of counsel shall not be* |

[41] Defendant took a writ to this Court on the trial court's denial of Mr. Burns' termination. This Court denied his writ on August 11, 2011, finding that "trial in this case is scheduled to commence on Tuesday, August 16, 2011. The Victors have sought to terminate Mr. Burns, the eighth attorney in this case, eight days before trial, which, in a murder case, is tantamount to the day of trial." This Court went on to find that defendant's "attempted termination of Mr. Burns is no more than a tactic to delay the trial."

*cause for a continuance of the trial. Counsel will only be permitted to enroll with the understanding that he/she is prepared to comply with all scheduled deadlines, hearings and trial.*" (Emphasis added).[42]

On the morning of trial, six months after the trial court set the trial date and defendant's previous attorney had withdrawn from the case, Tim Yazbeck moved to enroll as counsel of record, predicated on the granting of a trial continuance. This action was taken despite the trial court's January 21, 2014 admonishment to defendant that the retention of new counsel "shall not be cause for a continuance of the trial.[43] Counsel will only be permitted to enroll with the understanding that he/she is prepared to comply with all scheduled deadlines, hearing and trial."

The trial judge offered Mr. Yazbeck, instead, the opportunity to serve as stand-by counsel to the Victors on the condition that the case went on. Mr. Yazbeck declined the court's offer to assist as standby counsel, stating he would be unprepared to proceed in a standby capacity without a continuance.

In the present case, there is no evidence in the record that a written motion for a continuance was filed or that an oral motion was made seven days in advance of trial, as per La. C.Cr.P. art. 707. Nevertheless, there is a jurisprudential exception to the requirement for a written motion where the circumstances producing the motion occur unexpectedly and there is no opportunity to prepare the motion. *See State v. Bartley*, 03-1382 (La. App. 5 Cir. 3/30/04), 871 So.2d 563, 567, *writ denied*, 04-1055 (La. 10/1/04), 883 So.2d 1006 (citing *State v. Winfrey*, 97-427 (La. App. 5 Cir. 10/28/97), 703 So.2d 63, 68, *writ denied*, 98-264

---

[42] On this day, defendant filed a pleading titled "Notice of Intent and Exception to Proceedings held by Terminated Counsel" wherein he noted that he had terminated Stephen Yazbeck for "proceeding on a course of defense without approval of aggrieved defendant and against our will, choice, organization and dignity of our personal defense" as well as arguing that counsel had "ignored, shut-out and disregarded as intelligent beings having any right to our own decisions" thus "erod[ing] defendants [sic] constitutional, civil, and human rights … . Counsel has interfered with defendants' significant tactical decisions and has practice [sic] SUPREMACY in the manner of century pass [sic] 'STAR CHAMBER and have eroded our faretta [sic] rights … ."

[43] The record reflects that a hearing was held on January 21, 2014, but the transcript of that hearing is not included in the appellate record.

(La. 6/19/98), 719 So.2d 481 (holding that the defendant had not preserved the denial of his oral motion for continuance because no unexpected circumstances arose to prevent the filing of the written motion)); *see also State v. Shannon*, 10-580 (La. App. 5 Cir. 2/15/11), 61 So.3d 706, *writ denied*, 11-0559 (La. 9/30/11), 71 So.3d 283 (where this Court also held that the defendant should have filed a written motion to continue, but nevertheless reviewed the merits of the defendant's claim).

The record is devoid of any indication as to when Mr. Tim Yazbeck agreed to represent defendant. However, based on the withdrawal of defendant's last attorney, Stephen Yazbeck, Tim Yazbeck's father, six months prior to the commencement of trial, it appears unlikely that the circumstances producing defendant's motion occurred unexpectedly. Nevertheless, the merits of defendant's claim are addressed. *See State v. McGee*, 04-963 (La. App. 5 Cir. 1/11/05), 894 So.2d 398, 409-10, *writ denied*, 05-0593 (La. 5/20/05), 902 So.2d 1050; *Bartley*, *supra*; *Shannon*, 10-580, 61 So.3d at 714.

According to La. C.Cr.P. art. 712, "[a] motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor." The Louisiana Supreme Court has consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. *State v. Davenport*, 08-463 (La. App. 5 Cir. 11/25/08), 2 So.3d 445, 447, *writ denied*, 09-0158 (La. 10/16/09), 19 So.3d 473 (citing *State v. Manning*, 03-1982 (La. 10/19/04), 885 So.2d 1044, 1077, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005)). In addition, the Louisiana Supreme Court generally declines to reverse convictions even on a showing of an improper denial of a motion for a continuance absent a showing of

specific prejudice. *Id.* at 2 So.3d at 447. This Court has also recognized that the denial of a motion for a continuance is not grounds for reversal absent abuse of discretion and a showing of specific prejudice. *Id.*, citing *State v. Bartley*, 871 So.2d at 567.

Moreover, while a person accused in a criminal trial generally has the right to counsel of his choice, a defendant must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner, and at an appropriate stage of the proceedings. *State v. Reeves*, 06-2419 (La. 5/5/09), 11 So.3d 1031, 1057, *cert. denied*, -- U.S. --, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009); *State v. Bridgewater*, 00-1529 (La. 1/15/02), 823 So.2d 877, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003). There is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications to the orderly trial of cases. *State v. Leggett*, 363 So.2d 434, 436 (La. 1978).

It is further well established that a defendant in a criminal trial cannot, by a last minute change of counsel, force a postponement. *State v. Williams*, 00-1850 (La. App. 5 Cir. 4/11/01), 786 So.2d 785, 790-91, *writ denied*, 01-1432 (La. 4/12/02), 812 So.2d 666. In *State v. Divine*, 98-812 (La. App. 5 Cir. 5/19/99), 738 So.2d 614, 616-17, *writ denied*, 99-2393 (La. 2/4/00), 754 So.2d 222, *cert. denied*, 530 U.S. 1219, 120 S.Ct. 2227, 147 L.Ed.2d 258 (2000), defense counsel orally moved for a continuance on the day of trial, saying that the defendant had told him he had hired another lawyer to represent him. The trial court denied the motion, stating that there was a two-month period from the date of arraignment to trial for the defendant to retain new counsel or handle any other matters he felt appropriate. *Id.* at 3, 738 So.2d at 616. This Court could not say the trial court erred in denying the motion. *Id.* at 5, 738 So.2d at 617.

Here, defendant was initially indicted in 2008, with the last indictment occurring in April of 2010. The record indicates that as of April 2010, defendant changed, or attempted to change, counsel nine times.[44] Moreover, in January of 2014, the trial court set forth very specific pretrial deadlines, including a July 22, 2014 trial date with the admonition that defendant could retain new counsel, however, cautioning defendant that the retention of new counsel would not be cause for a continuance of the trial. Defendant had over four years from the date of the last indictment to select representation, and over six months from the court's admonishment.

The grant or denial of a motion to continue and a motion to enroll as counsel is within the well-founded discretion of the trial court. *Davenport, supra; State v. Ventris*, 10-889 (La. App. 5 Cir. 11/15/11), 79 So.3d 1108, *writs denied*, 13-1532 (La. 4/17/14), 138 So.3d 616 and 14-2237 (La. 4/24/15), 169 So.3d 355. Accordingly, we find no abuse of the trial court's discretion in denying defendant's motion to enroll predicated on a motion to continue the trial, especially when the proposed new counsel was the ninth change of counsel made by defendant, and at a time when the trial date had been set six months in advance with defendant's knowledge that another continuance would not be granted. Considering these facts, defendant failed to show he was attempting to exercise his right to choose an attorney at a reasonable time, in a reasonable manner, and at an appropriate stage of the proceedings. *See State v. Burbank*, 07-125 (La. App. 5 Cir. 10/30/07), 971 So.2d 1173, 1178, *writ denied*, 07-2287 (La. 4/25/08), 978 So.2d 364.

The record here does not support defendant's contention in his appellate brief that he was forced to proceed to trial without counsel or that he was not prepared to proceed *pro se* for trial. To the contrary, the record indicates that

_____

[44] This does not include the appointment and termination of standby counsel or the changing of counsel prior to the filing of the 2010 indictment, which totaled at least thirteen changes of counsel. *See* footnote 40, *supra*.

51

throughout the life of this case, defendant adamantly voiced his desire to represent himself at all stages despite express warnings by the trial court regarding self-representation. The above-mentioned timeline illustrates this fact by showing the self-representation colloquies conducted by the trial court and the numerous terminations of counsel, stand-by counsel, and court-appointed public defenders by defendant. At the hearing on October 18, 2010, defendant expressly stated that both previously retained and appointed counsel had not abided by his and Mrs. Victor's wishes, allegedly encouraging them to conduct contradictory defenses, and that they were adamant that they wished to maintain control of their own trial strategy. Defendant reiterated that position throughout the case. Accordingly, the trial court did not abuse its discretion in denying defendant's motion to enroll Mr. Yazbeck as counsel on the date of trial predicated on a continuance of the trial. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

### *Improper allotment of defendant's case*

In this assignment of error, defendant argues the allotment of his case to Division "B" of the 40th Judicial District Court following his 2010 indictment was a violation of his right to due process and equal protection when his original 2008 proceeding was first allotted to Division "A" of said court. He alleges that the allotment method employed by the State was also contrary to the local rules of the 40th Judicial District Court. He contends that his newly indicted 2010 case should have remained in Division "A" to protect him from the State's ability to "judge shop." Defendant claims the irrevocable harm and/or prejudice caused by the erroneous allotment procedure changed the course of the prosecution for defendant's entire case. Defendant alleges that the 2010 indictment would have "never survived in front of Judge Madeline Jasmine in section 'A,'" because she

52

knew and understood the case "like no other judge in the parish." Thus, defendant implies that the State violated his equal protection and due process rights by purposefully having the case assigned a new number so it could be allotted to a different judge.

The State responds that the allotment of defendant's case was proper because it was assigned according to the applicable rules of court, and thus, the trial court's denial regarding the transfer of defendant's 2010 case to Division "A" was proper.

As previously noted, *supra*, on April 15, 2008, defendant was charged by indictment with one count of first degree murder, in violation of La. R.S. 14:30. Defendant's case was randomly allotted to Division "A" under case number 2008-CR-165 of the 40th Judicial District Court. On September 22, 2009, both defendant and co-defendant's charges were amended by indictment to second degree murder, while engaged in the perpetration of the crime of cruelty to a juvenile, in violation of La. R.S. 14:30.1. Defendant subsequently filed a motion to quash the indictment, which was granted by Judge Jasmine on February 4, 2010. Though originally filing a motion for reconsideration and alternatively a notice of appeal, the State filed a notice of dismissal without prejudice of all pending charges on April 6, 2010.

Six days later, on April 12, 2010, a newly empaneled grand jury re-indicted defendant and co-defendant with second degree murder while engaged in the perpetration of the crime of cruelty to a juvenile, in violation of La. R.S. 14:30.1(A)(2)(b). The case was randomly allotted to Division "B," case number 2010-CR-172 of the 40th Judicial District Court, Judge Mary Hotard Becnel presiding. Defendant filed an "Objection to 'Allotment' of Case to Division 'B' and Motion for Transfer to Division of Original Allotment Division 'A,'" on

53

May 17, 2010. The motion to transfer to the originally allotted division was heard on August 4, 2010, and denied with written reasons on August 18, 2010.[45]

After taking the matter under advisement, the court issued written reasons for its judgment denying defendant's motion to transfer. In its reasons, the trial court found that at the time the grand jury returned the April 12, 2010 indictment, there were no felony cases pending against defendant. Thus, the court found it was proper to treat the 2010 indictment as a new case by assigning it a new case number and allotting the case randomly. The trial court further noted that the random allotment procedure employed by the Clerk of Court was not contrary to the local rule in Appendix 14.0A of the 40th Judicial District Court, because the local rule was removed pursuant to an *en banc* order after which it was determined that the local rule (which provided for the division of subclasses of felonies) had no reasonable basis, was too onerous for the clerk's office, and had never been actually followed.

Additionally, the judge noted that, unlike some district courts that have a local rule in place regarding the allotment of subsequent indictments arising out of the same transaction or occurrence to the division of original allotment, the 40th Judicial District Court has no such local rule. Finding no harm to defendant due to lack of such a local rule, the trial court considered this matter case-specific in disagreeing with defendant's argument that a lack of such a rule promoted judge-shopping.

Thereafter, defendant's counsel filed a timely writ application with this Court challenging the trial court's ruling. This Court granted review, but denied relief on February 4, 2011, finding "[t]he allotment of the present matter violated

---

[45] Prior to the filing of the motion objecting to the allotment, on May 12, 2010, defendant filed a Motion to Recuse all of the judges of the 40th Judicial District Court. All matters pending in the trial court were stayed pending resolution of the motion to recuse, which was heard on August 4, 2010, and denied by a judge *ad hoc* on August 18, 2010, as noted earlier and below.

neither the applicable Rules of Court nor due process. Accordingly, on the showing made, the writ is denied."

The arguments presented by defendant herein appear to be essentially the same as those made in his prior writ application. Under the discretionary principle of "law of the case," an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case. *State v. Burciaga*, 05-357 (La. App. 5 Cir. 2/27/06), 924 So.2d 1125, 1128; *State v. Junior*, 542 So.2d 23, 27 (La. App. 5 Cir. 1989), *writ denied*, 546 So.2d 1212 (La. 1989). The principle is applicable to all decisions of an appellate court, not solely those arising from full appeal. *State v. Johnson*, 06-859 (La. App. 5 Cir. 4/11/07), 957 So.2d 833, 840. One reason for imposition of the doctrine is the avoidance of indefinite re-litigation of the same issue, but it will not be applied in cases of palpable former error. *Id.* Reconsideration is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. *State v. Davis*, 03-488 (La. App. 5 Cir. 11/12/03), 861 So.2d 638, 641, *writ denied*, 03-3401 (La. 4/2/04), 869 So.2d 874; *In re K.R. W., Jr.,* 03-1371 (La. App. 5 Cir. 5/26/04), 875 So.2d 903, 905.

Here, defendant has failed to cite to any new facts adduced at trial or additional jurisprudence tending to indicate that this Court's prior disposition was patently erroneous and produced an unjust result. However, since prior denial of supervisory writs does not preclude reconsideration of the issue on appeal, the merits of defendant's assignment will be addressed. *See State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749, 755, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999); *State v. Cowart*, 01-117 (La. App. 5 Cir. 3/26/02), 815 So.2d 275, 290, *writ denied*, 02-1457 (La. 5/9/03), 843 So.2d 387.

In this assignment, defendant contends that when the grand jury re-indicted him on April 12, 2010, the case should have gone to Judge Jasmine's division rather than being randomly re-alloted to Judge Becnel's division.

Uniform District Courts Rule 14.1 provides:

(a) **Unless a different method is set forth in Appendix 14.1, if a defendant has a felony case pending and previously allotted, any new felony arrest for that defendant shall be allotted to the division to which the pending felony was allotted.** This "felonies-following-felonies" rule also applies to any pending felony arrests for a co-defendant with a new arrest and billed as a co-defendant.

(b) **For purposes of this Rule, a felony case remains pending until any of the following events has occurred:**

(1) a bill of information or indictment is filed or amended, reducing the case to a misdemeanor;

(2) **the District Attorney's Office enters a *nolle prosequi* in a case**; or

(3) there is an adjudication of guilty by plea or trial.

(Emphasis added.)

In its reasons for judgment, the trial court noted that

[a]ccording to Rule 14.1, the case against the defendants ... assigned to [Judge Jasmine's division] was terminated upon the notice of dismissal filed by the State on April 6, 2010, following the granting of the motion to quash.[46] Therefore, at the time of the indictment returned by the grand jury on April 12, 2010, there were no felony cases pending against the defendants. As such, the court finds it was proper to treat the third indictment against the defendants as a new case by assigning it a new case number and allotting the case by random allotment.

The trial court properly agreed that Rule 14.1 only applies when a defendant has a felony case pending and previously allotted. Felony cases cease to be considered pending when the "District Attorney's Office enters a *nolle prosequi* in a case." *See* Uniform District Court Rule 14.1. Here, the State filed a *nolle prosequi* on April 6, 2010, six days before defendant was re-indicted by a newly empaneled grand jury. Thus, Rule 14.1(a) does not apply.

---

[46] Also, in its reasons for judgment, the trial court found that the State's motion to dismiss was actually "superfluous" following the grant of defendant's motion to quash, the latter being sufficient on its own to dismiss the case.

Defendant avers that the system of allotment employed promotes "judge shopping" by the State and that defendant's case would have remained in Judge Jasmine's division after re-indictment under the local rules of other Louisiana judicial districts. Defendant cites *State v. Simpson*, 551 So.2d 1303, 1304 (La. 1989), the seminal Louisiana case dealing with random allotment, in support of his theory.

In *Simpson*, the allotment process was one in which, according to the stipulation of the parties, "the judges [were] chosen by the district attorney's office." The Louisiana Supreme Court pertinently held that "[t]o meet due process requirements, capital and other felony cases must be allotted for trial to the various divisions of the court or to judges assigned criminal court duty, on a random or rotating basis or under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned." (Footnotes omitted.) *Id.*

Also, in *State v. Rideau*, 01-3146 (La. 11/29/01), 802 So.2d 1280, another case cited by defendant, the Supreme Court determined that a procedure for randomly allotting capital cases on a rotating basis until all divisions of the court had been assigned a capital case did not satisfy *Simpson* because the district attorney still retained a direct role, albeit a diminished one, in the allotment procedure.

In this case, defendant is essentially complaining that his due process rights were violated because, in the 40th Judicial District, the State "was able to assign the case a new number to automatically move the case into the judge of choice by the rule of allotment." However, in this case, there was no violation of the *Simpson* rule because defendant has failed to show that the prosecutor had the power to influence the allotment of defendant's case.

57

And while defendant appears correct in his assertion that some judicial districts have a rule whereby his case would have been re-assigned to Division "A" after the filing of a new indictment, defendant cites to no law or jurisprudence (nor has any jurisprudence been located) indicating that because a majority of Louisiana judicial districts adhere to a rule, the 40th Judicial District must follow the same rule.[47]

Defendant also asserts that the allotment of his case was "contrary to the local rules of the 40th JDC." To the extent that defendant is arguing the allotment of his case violated the 40th Judicial District Court's former local rule addressing the system of random allotment of felony cases by subclass, defendant's argument must fail.

The 40th Judicial District Court's former local rule required the Clerk of Court to subdivide felonies into various classes before randomly allotting the cases to the various divisions of court. While defendant's case was never subdivided prior to random allotment, as Judge Becnel noted in her reasons for judgment, pursuant to an *en banc* order, on August 1, 2010, the judges of the 40th Judicial District Court agreed to remove the requirement in Appendix 14.0A of the local rule that cases be subdivided into classes because "such a system of allotment had no reasonable basis and was too onerous on the clerk's office." According to the trial court, the local rule had never been followed. The trial court concluded that there was no prejudice to defendant and "to now reallot this case according to a rule that has never been followed and is no longer in effect would be extremely

---

[47] Defendant claims that true bills were returned in three existing 40th Judicial District Court cases: "*State v. McGee*, 2009-CR-515, Div. 'B'; *State v. Warren*, 2009-CR-554, Div. 'B'; and *State v. Stewart*, 2009-CR-387, Div. 'C,'" which all kept their same docket numbers and original allotted divisions, in support of his argument that his case was the only one to be singled out and re-allotted to a new division. However, the facts and circumstances surrounding those cases are unknown and do not appear in the record.

burdensome to the court and actually promote the 'judge-shopping' of which defendants complain."

Also, the allotment procedure employed here was not done by numerical rotation, which would invite the manipulation of allotments.[48] Appendix 14.0A to District Rule 14.0 clearly states that cases are to be grouped into subclasses and then randomly allotted to judges of the 40th Judicial District Court. Under the 40th Judicial District Court's former local rule, there is no requirement that a judge could not be assigned another subclass of a case until every judge in the judicial district has been assigned such a case, which would appear to violate due process by encouraging manipulation of allotments. In the present case, defendant has not shown that the district attorney could have known which judge defendant's case would be assigned to because his case was randomly allotted.

Thus, the allotment in this case complied with the *Simpson* rule that felony cases must be randomly allotted "or [allotted] under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned." *Simpson, supra.* Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

### *Violation of La. C.Cr.P. art. 673 after motion for recusal filed*

In this assignment of error, defendant argues that the judges of the 40th Judicial District Court engaged in a "scheme to illegally subject [him] to a trial without in personam jurisdiction over [him]." He avers that he submitted prima facie proof of the judges' inherent bias and established that they were "collectively

---

[48] *See State v. Reed,* 95-0648 (La. 4/28/95), 653 So.2d 1176, where the Louisiana Supreme Court noted that the allotment procedure at issue was one where homicide and rape cases were randomly allotted to divisions; however, divisions that had been previously allotted homicide and rape cases could not be allotted another homicide or rape case until each division had received one. At that point, the procedure would (presumably) start over again until each division had received a homicide or rape case. The court determined that this procedure violated due process by encouraging manipulation of allotments, the very sort of mischief the Supreme Court sought to end in *Simpson, supra.*

59

embroiled in an ongoing conspiracy to deprive [him] of protections, substantive and inalienable rights due [him] by the U.S. Constitution." Defendant asserts that based on these issues, he filed a motion to recuse the judges of the 40th Judicial District Court, but that despite the filing of said motion, which he claims should have immediately stopped any proceedings in the case, the judges continued to act in violation of La. C.Cr.P. art. 673. Accordingly, defendant maintains that it was error for the judges to have acted on his case before final consideration of his motion to recuse was heard. He maintains that this alleged error renders the judicial actions taken in this case null and void.

Here, defendant does not allege that his motion to recuse the judges of the 40th Judicial District Court was erroneously denied; rather, defendant contends that the trial court improperly took actions in his case despite his pending recusal motion in violation of La. C.Cr.P. art. 673. Defendant also argues, in his reply brief, that the State's assertion that his motion to recuse was filed on May 12, 2010, is erroneous, as he contends it was filed on March 29, 2010, thus proving another instance in which he was denied substantive due process.

La. C.Cr.P. art. 673 provides:

A judge has full power and authority to act, even though a ground for recusation exists, until he is recused, or a motion for his recusation is filed. The judge to whom the motion to recuse is assigned shall have full power and authority to act in the cause pending the disposition of the motion to recuse.

Defendant contends in his reply brief that he filed the motion to recuse on March 29, 2010. The record shows a motion to recuse filed on May 12, 2010 was signed by defendant on March 29, 2010. However, it must be remembered that Judge Jasmine had granted the motion to quash on February 4, 2010. Though the State did not file its motion to dismiss until April 6, 2010, the trial court noted in its ruling denying the objection to allotment that grant of the State's motion to

dismiss was "superfluous" once the motion to quash had been granted ending the prosecution. Thus, at the alleged filing date of March 29, 2010, the judgment granting the motion to quash had ended the case.

Defendant was again indicted on April 12, 2010. On May 12, 2010, defendant's "Motion for Recusal for all Judges that Sits En Banc in the Fortieth Judicial District Court for the Parish of St. John the Baptist in Both Civil and Criminal Matter, and Motion to have Louisiana Supreme Court Appoint Special Judge to Hear All Pending Trials" signed by defendant on March 29, 2010 was filed into the record of this proceeding. On May 13, 2010, an *en banc* order was issued by the three judges of the 40th Judicial District Court ordering that "Judges Madeline Jasmine, Mary Hotard Becnel and J. Sterling Snowdy be and are hereby recused from hearing the recusal in these matters." The order further stated that "all proceedings are stayed pending the hearing on the recusal" and requested that the Louisiana Supreme Court appoint a judge *ad hoc* to hear and preside over the recusal matter.

On May 21, 2010, defendant filed a "Motion to Immediately have Hearings or Ex-Parte Order to Reinstate Existing Bonds ... or an Order of Habeas Corpus ... and to Stay any Order for Recusal hearing of All Judges Prior to Said Above Reinstatement of Bonds ... ." On May 24, 2010, Judge Becnel issued an order acknowledging the receipt of defendant's Writ of Habeas Corpus, but reminded defendant that per the May 14, 2010 *en banc* Order, all proceedings had been stayed pending the recusal hearing.[49] On May 25, 2010, the Louisiana Supreme Court assigned retired Judge Frank Foil as judge *ad hoc* of the 40th Judicial

---

[49] Other *pro se* motions were filed between June 15, 2010 and the date of the recusal hearing on July 1, 2010. These motions included a "Motion to Stay Any Order for Recusal Hearing of All Judges ...," "Motion to Refuse Indictment without Dishonor," "Motion to Dismiss Indictment," "Motion for the Adoption of Pre-Trial and All Other Motions of Named Defendants," "Motion to Refuse Court's Appointment of Public Defendant [sic] Office," "Motion to Stay," "Motion for Reinstatement of Bond ...," and two motions to quash. No action by Judge Becnel, or any other judge, was taken on these motions prior to the recusal hearing.

61

District Court to preside over defendant's recusal motion. On June 21, 2010, Judge Foil granted attorney Morris Reed's motion to enroll as counsel of record for defendant for purposes of the motion to recuse hearing. On July 1, 2010, a hearing was held on defendant's motion to recuse. At the conclusion of the hearing, *ad hoc* Judge Foil denied defendant's motion.

Defendant's allegation that actions were taken on his case while his motion to recuse was pending is not supported by the record. Defendant does not set forth the alleged "acts" that were performed by the trial court while the motion was pending, and after a careful review of the record, no such acts can be found. In fact, all proceedings were explicitly stayed per the May 14, 2010 *en banc* order, contrary to defendant's allegations that the judges of the 40th Judicial District Court acted in the case while the motion to recuse was pending. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER SIX

### *Denial of defendant's expert witness testimony*

In this assignment of error, defendant argues that he was denied his right to present a defense when the trial court precluded his proposed defense expert witness, Dr. Velva Boles, from testifying regarding the cause of M.L.'s death. He contends that Dr. Boles' testimony could have assisted the defense in the cross-examination of the State's expert pathologist, provided alternative explanations for the "physical findings" in this case, and aided in determining whether there was sufficient evidence to raise the "parental-discipline defense." He maintains that the State never conclusively established an undisputed cause of death, and that the preclusion of critical medical testimony of Dr. Boles, which he claims would have refuted the State's evidence, severely crippled his defense. He notes that Dr. Boles was previously admitted as an expert witness by Judge Jasmine in a pre-trial bond

62

hearing conducted under the original first degree murder indictment brought against him. Defendant avers that despite Dr. Boles' roster of qualifications in areas directly related to the medical issues at stake in this case, she was erroneously rejected as an expert witness who could have provided testimonial evidence regarding defendant's innocence. Defendant concludes that the trial court deprived him of his Fourteenth Amendment right to equal protection when it denied him the opportunity to utilize Dr. Boles as his expert witness on the grounds that she was not board certified as a forensic pathologist when other physicians lacking in such qualifications have been permitted to testify as expert witnesses.

The State responds that the trial court properly ruled that Dr. Boles could not testify as an expert witness in this case based upon the fact that her medical license had been revoked by the State of Louisiana on grounds of unprofessional conduct, having misrepresented herself on numerous occasions before courts of law regarding her credentials.

Louisiana Code of Evidence art. 702, which controls the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In reviewing the decision of a trial court in qualifying a witness as an expert, courts typically place the burden on the party offering the witness as an expert. *State v. Craig*, 95-2499 (La. 5/20/97), 699 So.2d 865, 870, *cert. denied*, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997). The Louisiana Supreme Court has consistently held that the competency of an expert witness is a question of fact to be determined within the sound discretion of the trial judge. The trial court's rulings on the qualifications of expert witnesses will not be disturbed absent an

abuse of discretion. *State v. Trahan*, 576 So.2d 1 (La. 1990); *State v. Lewis*, 353 So.2d 703 (La. 1977); *State v. Gray*, 351 So.2d 448 (La. 1977); *State v. Madison*, 345 So.2d 485 (La. 1977); *State v. Marks*, 337 So.2d 1177 (La. 1976).

A trial court acts as a gatekeeper to the admissibility of expert testimony. *State v. Foret*, 628 So.2d 1116, 1121 (La. 1993). "The objective of that [gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Generally, the test of competency of an expert is the expert's knowledge of the subject about which he is called upon to express an opinion. *State v. Ferguson*, 09-1422 (La. App. 4 Cir. 12/15/10), 54 So.3d 152, 166, *writ denied*, 11-0135 (La. 6/3/11), 63 So.3d 1008. A combination of specialized training, work experience, and practical application of the expert's knowledge can combine to establish that person as an expert. *Id*. Courts can also consider whether a witness has previously been qualified as an expert. *Craig, supra*. Importantly, the refusal of a trial court to receive expert testimony "will rarely, if ever, provide grounds for reversal." *See State v. Stucke*, 419 So.2d 939, 944 (La. 1982).

In the instant case, we find no abuse of discretion in the trial court's ruling that defendant's proposed expert, Dr. Boles, was not qualified to provide expert testimony in the field of forensic pathology.

Pursuant to defendant's questioning, Dr. Boles testified regarding her education, experience, and alleged qualifications as a proposed expert witness in the field of forensic pathology. Dr. Boles was specifically questioned about her

64

pathology experience. She explained that during her medical studies, she received training in classical and anatomical pathology at the University of Pittsburgh through her enrollment in the Department of Pathology. Dr. Boles testified that pursuant to her forensic medicine training, she received a level five Certified Medical Investigator certification.[50]

Dr. Boles testified that she had observed autopsies performed by physicians in the field of forensic pathology and had worked with "groups to review autopsies, to review medical records, and provide a written report with respect to any processes that were performed" at the request of attorneys. Dr. Boles testified that she received continuing medical education hours, was currently employed as an independent physician, and was not on staff with any medical facility.[51] When questioned as to whether she had testified or been involved as an expert in the investigation of a first degree murder trial, Dr. Boles testified that she and "several other persons" "confer[red]" with the prosecution on "matters presented" in a first degree murder trial in Las Vegas, Nevada. She concluded that she believed her credentials qualify her as an expert in the fields of forensic pathology and medical investigation.

During the State's traversal, Dr. Boles was confronted with documentation concerning the revocation of her medical license. Despite being confronted with documentation from the Louisiana State Board of Medical Examiners, Dr. Boles denied any knowledge that her license to practice medicine in Louisiana had been revoked. She further denied the State's allegation that she had been precluded from testifying as an expert in the case of *Hamilton v. Negi*, in the United States

---

[50] Dr. Boles explained that a level five certification permits her to write a report giving her opinion of the circumstances and events at a crime scene.

[51] Dr. Boles was also questioned about her medical publications, which appear to have been written on topics unrelated to the instant matter, such as "Senior Citizen Disparity of Care," potable water associated with disasters such as Hurricane Katrina, and a book entitled "Salutary Action" addressing the healthcare industry, pharmaceuticals and the epidemic of obesity in America.

District Court for the Western District of Louisiana, on the grounds that she had been untruthful about her credentials concerning her alleged Ph.D. in pathology.[52] Dr. Boles also stated that she had no knowledge of ever being sued for malpractice, and that no disciplinary action had ever been taken against her by the Louisiana Board of Medical Examiners because she falsely represented that she had completed a residency at Tulane University in pediatrics.

The State then introduced documentation from the Louisiana Board of Medical Examiners (the "Board") confirming that on April 20, 2009, a complaint was investigated by the Board regarding Dr. Boles' untruthfulness in her application for medical staff privileges at Christus St. Frances Cabrini Hospital in Alexandria, Louisiana. The Board's investigation disclosed that Dr. Boles had omitted or provided different years for her date of birth in communications with the hospital, in her application for licensure with the Board, on her application to take the "USMLE," on her driver's license, and on her medical school records. The investigation further disclosed that Dr. Boles attempted to apply for privileges requiring successful completion of a residency program in Internal Medicine when

---

[52] In the case of *Hamilton v. Negi*, 2012 U.S. Dist. LEXIS 44409 (W.D. La. 3/15/12), United States Magistrate Judge James Kirk presided over a *Daubert* hearing to determine whether Dr. Velva Boles could serve as plaintiff's expert witness in the case. During the hearing, Dr. Boles was questioned about her education, training, and experience as an expert witness and the preparation of her report. The magistrate judge concluded that Dr. Boles was unqualified to testify as an expert because she "repeatedly misrepresented her qualifications to employers and courts of law." Magistrate Kirk noted that Dr. Boles stated that she had earned degrees that she had not earned and claimed to have testified as an expert witness in trials in which she never participated. He further explained that Dr. Boles testified in other legal matters in which she stated she obtained a Ph.D. in pathology, when she did not possess such credentials. One of these legal matters in which Dr. Boles misrepresented her credentials as a "Ph.D. classical pathologist" was when defendant in the instant matter was first charged with first degree murder: *State of Louisiana v. Errol Victor*, Case Number 08-165, 40th Judicial District Court, St. John the Baptist Parish. Magistrate Kirk also indicated that Dr. Boles had a history of misrepresenting her qualifications in her applications for medical staff membership and privileges. Also, according to various employment records, Dr. Boles' professional experience had been called into question. In response to a requested evaluation by Christus St. Frances Cabrini Hospital, Tulane Medical Center stated her "basic medical knowledge, professional judgment, sense of responsibility, ethical conduct, competence, skill and ability to work with others are all 'poor.'" Most notably, Magistrate Kirk stated that Dr. Boles had previously misrepresented her experience as an expert witness in two matters, one of which was *State of Louisiana v. Errol Victor*, Case Number 08-165.

In *Hamilton v. Negi*, 2012 U.S. Dist. LEXIS 44160, 09-860 (W.D. La. 3/29/12), United States District Judge Dee Drell agreed with the recommendations of Magistrate Judge Kirk and granted the defendants' *Daubert* Motion to exclude the testimony of Dr. Boles as an expert witness and further denied the plaintiff's motion to retain Dr. Boles as an expert witness. The court found that Dr. Boles lacked the qualification as an expert and expressed its "*consternation at Velva Boles' apparently blatant use of misrepresentation in whatever quest she is on. We cannot discern from the record how she was recruited or wound up on Mr. Hamilton's proposed list of witnesses. Dishonesty has no place in the qualifications of a supposed 'expert.'*" (Emphasis added.)

she had not completed such a program. Dr. Boles further reported that she possessed a specialty in Internal Medicine and Pediatrics having completed a residency program at Tulane University Medical School in New Orleans, Louisiana; however it was discovered that she left the program in 1998 prior to completion.

The Board's investigation confirmed that the filing of a formal administrative complaint was warranted on charges that Dr. Boles exhibited unprofessional conduct in violation of La. R.S. 37:1285(A)(13). A formal complaint was thus filed. One of the bases for the complaint was the finding by the District Court of the Western District of Louisiana, which excluded the proposed expert testimony of Dr. Boles in the case of *Hamilton v. Negi*, case number 09-CV-0860.[53] The Board reported that the district court found Dr. Boles had "testified under oath in two other matters that she held a Ph.D. in pathology, although she testified that she did not have that degree in the *Hamilton* case. The court further found [Dr. Boles] had misrepresented her experience as an expert witness." The Board noted that in the *Hamilton* case, Dr. Boles denied under oath that she had ever been sued for malpractice, when it appeared that she had knowledge that she had been a named defendant in a lawsuit. She further testified that she had been accepted as an expert witness in a case in the Eastern District of Louisiana, when in fact she had not. When reviewing the *Hamilton* case, it was further discovered that Dr. Boles did not reveal that she had, at one time, been Mr. Hamilton's treating physician. The Board found Dr. Boles guilty of unprofessional conduct, noting Dr. Boles' transgressions to be "particularly egregious." Thus, the Board issued an opinion that Dr. Boles *"shall not serve as a medical expert or consultant for the purposes of litigation for the remainder of her medical*

---

[53] *See* footnote 52, *supra*, regarding the detailed findings of the *Hamilton* case.

67

*career*." (Emphasis added.) The Board revoked her medical license on April 14, 2014 based on her unprofessional conduct.

At the conclusion of Dr. Boles' testimony regarding her qualifications, defendant offered Dr. Boles as an expert in the field of forensic medicine. The trial court denied defendant's request, finding Dr. Boles was not qualified to testify as an expert in the field of forensic pathology or forensic medicine.

Defendant then proffered the testimony Dr. Boles gave at the preliminary hearing held on May 29, 2008 before Judge Jasmine under the original indictment filed against defendant. The transcript from the preliminary hearing indicates that Dr. Boles testified regarding her qualifications as an expert witness in the field of pathology. Dr. Boles untruthfully stated that she possessed a Ph.D. in classical pathology and was board certified as a medical investigator. She was ultimately accepted, for the first time, as an expert in those fields by Judge Jasmine. The revocation of Dr. Boles' medical license had not yet occurred at that time.

The qualification of an expert witness rests within the sound discretion of the trial judge. *Trahan, supra*. The overwhelming evidence presented to the trial court regarding Dr. Boles' credentials established her untruthfulness regarding the field of expertise in which defendant sought to have her qualified as an expert. It was established that the Louisiana Board of Medical Examiners had revoked Dr. Boles' medical license for dishonesty based upon false testimony regarding her credentials in previous cases, as well as in documentation submitted for employment purposes. In revoking her license, the Board explicitly ordered that Dr. Boles not testify before any court in Louisiana as an expert witness. Accordingly, we find that the trial judge did not abuse her discretion in refusing to allow Dr. Boles to testify as an expert in the present case. This assignment of error is without merit.

68

## ASSIGNMENT OF ERROR NUMBER SEVEN

### *Violation of right to a speedy trial*

In this assignment of error, defendant argues that the State failed to timely institute prosecution and commencement of trial, in violation of his statutory and constitutional right to a speedy trial. Defendant argues that he was denied access to the court for over five months after he declared his intent to represent himself. He argues that for the first five months after being arrested on May 4, 2010 on the third indictment, the court ignored and failed to address all of his pleadings. In particular, defendant argues that he was not arraigned on the third indictment for over 120 days, and that the trial court's failure to hold a *Faretta*[54] hearing in this time period denied defendant a speedy trial.

The State in turn argues that defendant's speedy trial rights were not violated when the length of the delay was minimal, defendant was the direct cause of the delays, based on the numerous repetitive and frivolous pre-trial motions filed, and defendant failed to appear for his first scheduled trial after fleeing the State of Louisiana for nine months. The State contends defendant employed these actions as dilatory tactics to avoid trial.

There are two separate and distinct bases for a defendant's right to a speedy trial: a statutory right granted by La. C.Cr.P. art. 701, and a constitutional right embodied in the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution of 1974. The two are not equivalent. *State v. Cowger*, 581 So.2d 283, 285 (La. App. 5th Cir. 1991); *State v. Sosa*, 446 So.2d 429, 432 (La. App. 4th Cir. 1984), *writ denied*, 450 So.2d 361 (La. 1984), *cert. denied*, 469 U.S. 866, 105 S.Ct. 209, 83 L.Ed.2d 140 (1984).

---

[54] *Faretta v. California, supra.*

69

A statutory speedy trial claim is a pre-trial claim that becomes moot upon conviction. *See State v. Johnson*, 622 So.2d 845 (La. App. 4th Cir. 1993). Any rights under La. C.Cr.P art. 701 become moot after conviction because the remedy for such a violation is the pre-trial release of the defendant, not a bar to prosecution. *State v. Johnson*, 08-1156 (La. App. 5 Cir. 4/28/09), 9 So.3d 1084, 1091, *writ denied*, 09-1394 (La. 2/26/10), 28 So.3d 268 (citing *State v. Cowger*, 581 So.2d at 286).

The constitutional right to a speedy trial attaches when an individual becomes an accused, either by formal indictment or bill of information, or by arrest and actual restraint. *State v. Pleasant*, 489 So.2d 1005, 1009 (La. App. 1st Cir. 1986), *writ denied*, 493 So.2d 1218 (La. 1986). Claims for speedy trial violations are evaluated under the four-factor test set forth in *Barker v. Wingo*, 407 U.S. 514, 530-531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). The considerations in determining whether a defendant has been deprived of a speedy trial are: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his rights; and (4) the actual prejudice to the defendant. The initial inquiry is into the length of the delay. If the delay is presumptively prejudicial, there will be an inquiry into the other factors. *Id.* The peculiar circumstances of the case will determine the weight to be ascribed to the length of the delay and the reason for the delay. *Cowger, supra* at 286; *State v. Reaves*, 376 So.2d 136, 138 (La. 1979); *see also Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). A delay that is acceptable in one case may not be acceptable in another because the complexity of the case must be considered. *Gray v. King*, 724 F.2d 1199, 1202 (5th Cir. 1984), *cert. denied*, 469 U.S. 980, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984) (citing *Barker*, 407 U.S. at 531). The manner of proof must also be considered, as must the gravity of the alleged crime. *Id.*

70

There is no time limitation upon the institution of prosecution for any crime for which punishment may be life imprisonment. La. C.Cr.P. art. 571. Defendant in this matter was charged with and convicted of second degree murder, the penalty for which is life imprisonment. La. R.S. 14:30.1. Also, where a criminal prosecution has been timely instituted and then dismissed, a new prosecution for the same or lesser offense based on the same facts may be instituted within the time established in Title XVII, Chapter 1 of the Louisiana Code of Criminal Procedure, or within six months of the date of dismissal, whichever is longer. La. C.Cr.P. art. 576.

Defendant was originally indicted on charges of first degree murder on April 15, 2008. On September 22, 2009, a grand jury issued an amended indictment charging defendant with second degree murder. On February 4, 2010, the trial court granted defendant's motion to quash the amended indictment.

After dismissing the charges, on April 12, 2010, a newly empaneled grand jury returned an indictment charging defendant with second degree murder in perpetration of cruelty to a juvenile. It is under this indictment that defendant was convicted. Both the original indictment and the current indictment[55] were brought timely according to La. C.Cr.P. arts. 571-572. Thus, the State complied with the time limitations for institution of prosecution in this matter.

With respect to the issue as to whether the State timely commenced trial, La. C.Cr.P. art. 578 provides that no trial shall be commenced in felony cases after two years from the date of institution of prosecution. The Louisiana Supreme Court has explained that the "statutory periods of limitation 'enforce the accused's right to a speedy trial and ... prevent the oppression caused by suspending criminal prosecutions over citizens for indefinite periods of time.'" *State v. Romar*, 07-

---

[55] The current indictment was brought approximately two months after the amended indictment was quashed.

71

2140 (La. 7/1/08), 985 So.2d 722, 725. The date of institution of prosecution is the date when the indictment is returned or the bill of information is filed. *State v. Smith*, 07-959 (La. App. 5 Cir. 3/11/08), 982 So.2d 831, 834; *see also* La. C.Cr.P. art. 934(7).

Once a defendant shows that the State has failed to commence trial within the time periods specified by the general rule governing time limitations for commencement of trial, the State bears a heavy burden to demonstrate that either an interruption or a suspension of the time limit tolled prescription. *State v. Morris*, 99-3235 (La. 2/18/00), 755 So.2d 205.

For purposes of the instant analysis, the period of limitation established by Article 578 shall be interrupted if "[t]he defendant at any time, with the purpose to avoid detection, apprehension, or prosecution, flees from the state … ." La. C.Cr.P. art. 579(A)(1). The two-year limitation established by Article 578 shall commence to run anew from the date the cause of the interruption no longer exists. La. C.Cr.P. art. 579(B). Moreover, the time limitation for the commencement of trial is suspended when a defendant files a motion to quash or other "preliminary pleas." La. C.Cr.P. art. 580. A "preliminary plea" under Article 580 is any pleading or motion filed by the defense which has the effect of delaying trial. *State v. Brooks*, 02-792 (La. 2/14/03), 838 So.2d 778, 782. When a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but, in no case shall the State have less than one year after the ruling to commence trial. *Id.*

Defendant was indicted for second degree murder in perpetration of cruelty to a juvenile on April 12, 2010. Thus, barring interruption under La. C.Cr.P. art.

579 or suspension under La. C.Cr.P. art. 580 of the time delay, the State had until April 12, 2012 to commence trial.

The record reveals that arraignment was set for May 3, 2010; however, the minute entry shows that defendant did not appear. A minute entry from May 6, 2010 shows that arraignment was again set for May 17, 2010. It appears that defendant was not arraigned on the third indictment until August 16, 2010, at which time he refused to enter a plea, with the trial court entering a plea of not guilty for him. Defendant fails to show, however, how the delay in arraignment prejudiced him or affected his speedy trial rights.

Within that time span, the record shows that defendant filed multiple motions, including a Motion to Recuse the entire 40th Judicial District Court on May 12, 2010, as noted previously in this opinion. All matters in this case were stayed pending the hearing on that motion, which occurred on July 1, 2010. Accordingly, defendant's assertion that he was prevented access to the court during this time period is unsupported by the record, as defendant was in fact able to file many pleadings during this time period, though all rulings were necessarily stayed until his motion to recuse could be heard and decided. After the recusal motion was disposed of, the record shows that motion practice continued, with defendant filing a notice of intent to take writs on at least one trial court ruling, as well as a defense motion to continue filed on September 16, 2010, which was granted.

On October 18, 2010, approximately five months after defendant's arrest on the third indictment, and after the motion practice noted above, the trial court held an extensive hearing regarding defendants' desire to represent themselves and to refuse retained or appointed counsel. In a thorough hearing on the matter, defendant and Mrs. Victor unequivocally expressed their dissatisfaction with both prior retained and appointed counsel, stating that they wished to maintain control

73

of their own trial strategy, which prior counsel had not afforded them. At the conclusion of this hearing, defendant and Mrs. Victor were granted the right to represent themselves, with the court noting that they retained the right to hire counsel in the future if they wished. Defendant has failed to show, however, how the timing of this hearing caused him prejudice, and makes only conclusory allegations that substantial rights were affected. The record shows, contrary to defendant's assertions, extensive motion practice by defendant that belies defendant's assertion that his access to the court was restricted for a five-month period, or at all.

Defendant's trial was originally scheduled to commence on August 16, 2011; however, defendant failed to appear, having fled Louisiana to the State of Georgia. Accordingly, there was an interruption of the two-year time limitation set forth under La. C.Cr.P. art. 578. Thus, the two-year time limitation established by Article 578 did not start to run anew until defendant was returned to the State of Louisiana and appeared in court on July 16, 2012.[56] Accordingly, the State then had until July 16, 2014 to commence trial. However, the time limit for commencement of trial was further suspended by defendant's filing of numerous pre-trial motions. Among the numerous motions filed by defendant was a July 17, 2013 motion to quash based on double jeopardy grounds. The trial court denied defendant's motion to quash on September 18, 2013. Thus, the time between July 17, 2013 and September 18, 2013 was suspended. Additionally, on February 20, 2014, defendant filed a "Motion to Adopt all Motions filed naming above Defendants on the date of May 13, 2011," which the court granted the following day. Included within the May 13, 2011 motions was a "Challenge to the Array of

---

[56] In one of the trial court's written reasons for judgment denying defendant's motion to quash based on the expiration of the time limitation for the commencement of trial, the court stated that defendant was returned to the State of Louisiana on July 14, 2012.

74

the Grand Jury and Objection to Grand Jury" and "Motion for Change of Venue on the Basis of Pretrial Publicity." These particular motions were not ruled on until April 17, 2014. Accordingly, the time between February 20, 2014 and April 17, 2014 was suspended. *See State v. Rome*, 93-1221 (La. 1/14/94), 630 So.2d 1284 (holding that the filing of a motion to change venue was a preliminary plea that suspended rather than interrupted prescription under La. C.Cr.P. art. 580).

Also, on May 19, 2014, defendant made an oral motion to recuse the trial judge and Attorney General's Office, which was denied by the trial court the same day. *See State v. Langley*, 10-969 (La. App. 3 Cir. 4/6/11), 61 So.3d 747, *writ denied*, 11-1226, 78 So.3d 139 (La. 1/20/12), *cert. denied*, --- U.S. ---, 133 S.Ct. 148, 184 L.Ed.2d 73 (2012); *and State v. Vincent*, 02-1452 (La. App. 3 Cir. 4/2/03), 843 So.2d 1174 (holding that a motion to recuse the prosecutor is a preliminary plea suspending time limitations for commencement of trial). Finally, on July 16, 2014, defendant filed a motion to quash asserting that the time limitations for the institution of prosecution and the commencement of trial had expired. The trial court denied defendant's motion to quash on the morning of trial, July 21, 2014. Under La. C.Cr.P. art. 580, the State had one year from these rulings to commence trial. Based on the various suspensions caused by defendant's motions to quash or other preliminary pleas, the July 22, 2014 trial date was timely.

Despite the amount of time that passed between the institution of prosecution and trial, there was constant activity in the case and, as the record thoroughly documents, many delays were attributable to defendant. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER EIGHT

### *Violation of right to confrontation*

In this assignment of error, defendant argues his right to confrontation was violated when he was denied the ability to cross-examine Dr. Christy Montegut, the coroner who prepared the death certificate in this case.

Dr. Richard Tracy, the pathologist who performed the autopsy on M.L., testified that he prepared a report on his findings and forwarded the report to Dr. Montegut, the local coroner for St. John the Baptist Parish. Dr. Tracy explained that among the responsibilities of the coroner is the responsibility to issue a death certificate noting the manner of death. The death certificate issued by Dr. Montegut and dated May 5, 2008 was entered into evidence by defendant with no objection. Dr. Montegut was not called as a witness by either the State or the defense.

The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution specifically and expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." La. Const. art. I, § 16; *see also State v. Robinson*, 01-273 (La. 5/17/02), 817 So.2d 1131, 1135. Confrontation does not only mean the ability to confront the witnesses physically. Its main and essential purpose is to secure, for the opponent, the opportunity of cross-examination. *Id.* Cross-examination is the principal way to test the believability and truthfulness of the testimony, and it has traditionally been used to impeach or discredit the witness. *Id.*

For the first time on appeal, defendant argues that his Sixth Amendment right to confrontation was violated by his inability to cross-examine the coroner, Dr. Montegut. First, Dr. Montegut was not called as a witness by the State or by

76

the defense. Defendant could have subpoenaed Dr. Montegut as a witness at trial but chose not to do so. Second, at no time did defendant raise the issue that he was denied his right to confrontation by Dr. Montegut's failure to testify; thus, the issue was not properly preserved for appeal.

To preserve the right to seek appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. *See* La. C.Cr.P. art. 841; *State v. Smith*, 11-638 (La. App. 5 Cir. 3/13/12), 90 So.3d 1114 (citation omitted). In failing to object at trial, defendant waived the issue for appellate review. *See State v. Draughn*, 05-1825 (La. 1/17/07), 950 So.2d 583, 620-21, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); *State v. Davis*, 06-402 (La. App. 5 Cir. 11/28/06), 947 So.2d 48, 58-59, *writ denied*, 07-0003 (La. 9/14/07), 963 So.2d 996.

## ASSIGNMENT OF ERROR NUMBER NINE

### *Improper composition of the Grand Jury*

In this assignment of error, defendant argues that "the Parish of St. John, State of Louisiana, through its public assistance offices, has been violating the National Voters Right Act of 1993 ("NVRA"), which in turn had a direct impact on the composition" of the grand jury. Defendant submits that because of the parish's deliberate violations of the NVRA, he was deprived of a constitutionally protected right to a grand jury free from "systemic" discriminatory practices which had a discriminatory effect upon the composition of the grand jury in this case.[57]

First, defendant's brief contains no facts or argument regarding the composition of the grand jury empaneled in this case. Without this, it is unknown

---

[57] Specifically, defendant states the following as his assignment of error: "Unconstitutional jury-fixing resulting in discrimination and tainted jury pool requiring disqualification of all jurors (6th, and 14th Amend) [Motion to Quash and contemporaneous objection on/in the trial record]."

how and/or whether the array of the grand jury "had a discriminatory effect upon the composition of the grand jury" as defendant argues. Moreover, defendant provides no support for his blanket assertion that the St. John the Baptist Parish Clerk of Court deliberately violated the NVRA, in turn, producing a grand jury that had a discriminatory effect.

Second, for the first time on appeal, defendant raises a new ground for challenging the composition of the grand jury in this case that was not argued before the trial court. A defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal.[58] *State v. Jackson*, 450 So.2d 621 (La. 1984); *State v. Alvarez*, 10-925 (La. App. 5 Cir. 6/29/11), 71 So.3d 1079, 1085 (citing La. C.Cr.P. art. 841(A)).

Having failed to raise the issue regarding the alleged "deprivation of a constitutionally protected right" due to discriminatory practices by the clerk of court based on its deliberate violations of the "NVRA of 1993," defendant is precluded from raising this issue for the first time on appeal. *See State v. Evans*, 506 So.2d 1283 (La. App. 2nd Cir. 1987), finding that because the defendant made no objection to the composition of the jury venire, the challenged jurors, or the jurors who were seated, the defendant could not for the first time on appeal complain of denial of equal protection rights in the jury selection process. *See also* La. C.Cr.P. art. 419, providing that "[a] general venire, grand jury venire, or petit

---

[58] Specifically, on February 20, 2014, defendant filed a "Motion to Adopt All Motions Filed Naming Above Defendants on the Date of May 13th, 2011." Included within the adopted motions was a "Challenge to the Array of the Grand Jury and Objection to Grand Jury." Defendant challenged the grand jury on several bases, none of which included the parish's "deliberate violation of the NVRA" effecting an alleged discriminatory selection of potential grand jurors. Likewise, defendant was provided an opportunity to argue his motion on April 10, 2014, and to present evidence showing that the grand jury in this case was selected in violation of the law. At the motion hearing, defendant made no argument regarding the composition of the grand jury and did not present any evidence concerning the array of the grand jury. The trial court denied defendant's motion, finding that defendant made no argument and presented no evidence concerning the array of the grand jury. The court further noted that it is the "policy of the Clerk of Court of the Fortieth Judicial District to follow the law as set out in the Louisiana Code of Criminal Procedure for all matters involving the selection of both grand and petit juries," and that there was no reason to believe the clerk of court did not follow the law.

78

jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systemically excluded from the venires solely upon the basis of race."

## ASSIGNMENT OF ERROR NUMBER TEN

***State pursued a bad-faith indictment and prosecution against Mr. Errol Victor, Sr., Ls and Mrs. Tonya Victor, Ls. [sic] The prosecution as a whole was contrary to medical evidence and gender driven to the detriment of Mr. Errol Victor [Gender Discriminatory Motives][.][59]***

In this assignment of error, defendant contends that the State "rested its prosecution in total absence of any effort to present a prosecutorial case against Mrs. Victor." Without providing citations to the record or legal citations in support of his argument, defendant alleges that Mrs. Victor "was only jailed and kept incarcerated because of her efforts to render aid to her husband to prove his innocence." He avers that this case is one of prosecutorial misconduct against his wife for her "activism" on her husband's behalf, as well as a case targeted solely against him. He concludes that the case against his wife was a gender-based, pro-female prosecution aimed at "executing a feminist agenda" and that because there was never any real attempt by the State to prosecute Mrs. Victor, she was convicted by virtue of her presence in the courtroom. He further argues that this prosecutorial tactic was designed to ensure the conviction of the male defendant, himself.

The State argues that defendant's assignment of error is another resuscitation of several earlier claims made by defendant, including insufficiency of the evidence. The State further argues that defendant's assertion that this was a

---

[59] The assignment of error is reproduced *verbatim* from defendant's brief.

gender-based, pro-female prosecution used to ensure the conviction of the male defendant is unsupported.

Defendant's assigned error fails to reference specific record page numbers and citations to the authorities on which he relies to support his contentions, in violation of Rule 2-12.4(A) of the Uniform Rules of the Courts of Appeal. Nevertheless, defendant lacks standing to raise this issue. Defendant argues prosecutorial misconduct and "gender discrimination motives," asserting equal protection and due process violations on behalf of his wife. At the federal level, it has long been settled that "one may not raise the violation of a third person's constitutional rights." *State v. Owen*, 453 So.2d 1202, 1205 (La. 1984).

Also, intertwined with the alleged bad-faith prosecution effected against his wife, as well as vindictive prosecution against himself, defendant avers that the verdict in this case was contrary to the law and the evidence, claiming that his innocence was supported by his sons who were present when Mrs. Victor whipped M.L. and testified to such. This argument regarding the sufficiency of the evidence against defendant is addressed above.

## ASSIGNMENT OF ERROR NUMBER ELEVEN

### *Jurisdiction and Status*

In this assignment of error, defendant argues the trial court exercised "fraudulent in personam jurisdiction" over him.[60] Defendant claims that because he is not a "corporation," under La. R.S. 15:429 he could not be "sued" in criminal court for "statutory crimes set in place by the legal fiction of Louisiana for the murder of its corporate commercial property ... M.L." Defendant states that his denial of corporate jurisdiction would "leave any court 'in want of jurisdiction'

---

[60] Specifically, defendant states the following as his assignment of error: "When through negative averment of jurisdiction 'Status' and 'Jurisdiction' are placed at issue, the burden shifts to the purported party asserting competent jurisdiction."

except the United States Supreme Court, A Special Congressional Committee and/or the United Nations International Court of Justice, The World Court in The Hague, Netherlands."

In response, the State asserts that defendant failed to raise this issue before the trial court. Thus, the State contends that because a challenge to the court's jurisdiction must take place prior to trial, defendant's claim is untimely.

It appears that defendant assigns as error the lack of personal jurisdiction over him in this criminal matter. La. C.Cr.P. arts. 16 and 17 recognize the criminal jurisdiction of courts. The alleged jurisdictional issue raised by defendant for the first time on appeal has not been preserved for review on appeal. The record contains no motion or judgment of the trial court regarding the challenged jurisdiction based on defendant's lack of "corporate status" for this Court to review. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. *Alvarez, supra*; *State v. Simpkins*, 44,197 (La. App. 2 Cir. 5/13/09), 12 So.3d 1021, 1029, *writs denied*, 09-1229 (La. 2/5/10), 27 So.3d 296 and 09-2009 (La. 3/5/10), 28 So.3d 1004. Thus, this issue is not properly before the court on appellate review.[61]

### ASSIGNMENT OF ERROR NUMBER TWELVE

*Defendant complains that he was brought before a court which lacked competent jurisdiction to conduct proceedings against him due to pending judicial district-wide motion to recuse all judges of the 40th JDC and because defendant denied co[r]porate status. Defendant avers that these proceedings have root in vindictive prosecution because the D.A. and his staff were political and business enemies of defendant and the judicial process was utilize[d] to execute personal retribution against defendant. The case before the court is a complete derivative of the twice-dismissed cases: 2008-CR-165; 2010-CR-172, (66175, 66575, 66576, 46420). An resultant acquittal from abandonment of legal appeal, res nova*

---

[61] Defendant avers that he and co-defendant filed "UCC" forms to prove that they were not corporations. The record does contain a UCC form filed by defendant, but the record does show that this form was filed in connection with the bail bond proceeding and not for the purpose stated by defendant in brief.

***violation is claimed by both defendants[.]   [Aba]ndonment of legal appeal, res
nova violation is claimed by both defendants[.]***[62]

In this multi-faceted assignment, defendant first argues that the 2010

indictment used to charge and convict him in this case constituted *res judicata*.

Defendant claims that the State reinstituted charges against him with no new facts

or evidence after the previous dismissal of the 2008 indictment in violation of the

principles of *res judicata*. Within his *res judicata* argument, it appears defendant

also re-urges arguments made in several previous assignments of error. He again

alleges that the re-filing of charges against him was a tactical decision made by the

State to obtain a judge of its choosing.[63] Defendant also repeats that the judge to

whom his case was re-allotted after the filing of the new 2010 invalid indictment

lacked jurisdiction to act based on a pending recusal motion.[64] Lastly, he again

challenges the court's *in personam* jurisdiction over him, claiming that his lack of

"corporate status" rendered the trial court powerless to preside over his case.[65]

Only defendant's non-duplicative argument regarding the alleged *res

judicata* effect of the 2010 indictment will be addressed, as all others have been

previously addressed in response to defendant's other assigned errors.[66]

On July 7, 2013, defendant filed a motion to quash the indictment on the

basis of double jeopardy.[67] In defendant's motion, it was argued that Judge

Jasmine's granting of his motion to quash the amended 2009 indictment on

February 4, 2010 acted as a final judgment of acquittal, and thus, the re-filing of

the new April 2010 indictment violated the principles of double jeopardy. It was

further argued that the doctrine of collateral estoppel precluded the State from

---

[62] This assignment of error is reproduced essentially *verbatim* from defendant's brief.

[63] This issue was previously addressed in response to defendant's third assignment of error.

[64] This issue was previously addressed in response to defendant's fourth assignment of error.

[65] This issue was previously addressed in response to defendant's eleventh assignment of error.

[66] Again, defendant's assigned error fails to reference specific record page numbers and citations to the authorities on which he relies to support his contention that the 2010 indictment violates the principles of *res judicata*, as per Rules 2-12.4(A)(9)(a) and 2-12.13 of the Uniform Rules of the Courts of Appeal.

[67] A motion to quash is a proper procedural vehicle to obtain a dismissal of a charged offense on the basis that "a trial for the offense charged would constitute double jeopardy." La. C.Cr.P. art. 532(6).

prosecuting defendant for murder since Judge Jasmine "resolved the central issue of whether the victim died of natural causes or was murdered."

The Fifth Amendment's Double Jeopardy Clause protects against successive prosecutions following acquittal or conviction, as well as multiple punishments for the same offense. La. Const. art. I, § 15; La. C.Cr.P. art. 591, *et seq.* The collateral estoppel component of the Double Jeopardy Clause prohibits the State from re-litigating an issue of ultimate fact that has been determined by a valid and final judgment.[68] *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *State v. Cotton,* 00-0850 (La. 1/29/01), 778 So.2d 569, 574, *reh'g granted in part, on other grounds,* 00-0850 (La. 4/20/01), 787 So.2d 278. A fact is considered "ultimate" if it is necessary to a determination of the defendant's criminal liability. *State v. Miller,* 571 So.2d 603, 607 (La. 1990); *State v. Ingram,* 03-1246 (La. App. 5 Cir. 10/12/04), 885 So.2d 714, 716, *writ denied,* 04-3135 (La. 4/1/05), 897 So.2d 600.

The trial court denied defendant's motion to quash, finding that the State acted in accordance with Louisiana law by obtaining a new indictment after the amended indictment was quashed and that there had been no violation of defendant's Fifth Amendment right against double jeopardy. The trial judge's ruling on a motion to quash should not be reversed in the absence of a clear abuse of the trial court's discretion. *State v. Love,* 00-3347 (La. 5/23/03), 847 So.2d 1198, 1206.

The trial judge did not abuse her discretion in denying the motion to quash. As previously noted above, defendant's amended indictment was quashed by Judge

---

[68] The doctrines of *res judicata* and collateral estoppel have been applied almost interchangeably in Louisiana's criminal jurisprudence. Prior to *Ashe v. Swenson,* Louisiana adopted a theory of *res judicata* preventing criminal re-prosecution similar in effect to the *Ashe* holding. *State v. Latil,* 92 So.2d 63, 69 (La. 1956); *see also State v. Didier,* 263 So.2d 322, 325 n.4 (La. 1972). Since the opinion in *Ashe,* however, it appears the courts have been more inclined to employ the term "collateral estoppel." *State v. Duplechin,* 05-726 (La. App. 5 Cir. 1/31/06), 922 So.2d 655, 657, *writ denied,* 06-0475 (La. 9/22/06), 937 So.2d 378.

Jasmine with written reasons on February 4, 2010. Judge Jasmine determined that the indictment must be quashed because of the "participation of the St. John the Baptist Parish Sheriff's Deputy in the grand jury process as a grand juror while wearing a shirt which openly advertised his employment with an office inherently aligned with the State." The State filed a notice of dismissal without prejudice of all pending charges on April 6, 2010. On April 12, 2010, a newly empaneled grand jury re-indicted defendant and co-defendant.

Here, defendant avers that the evidence presented to the newly empaneled grand jury was identical to the evidence upon which the prior indictment, quashed by Judge Jasmine, was based. Thus, because defendant claims that the February 4, 2010 judgment granting the motion to quash was a final judgment, defendant argues that the State's recourse was to appeal the judgment and that the obtaining of a new indictment violated his constitutional rights.

As noted by the trial court in its reasons for judgment, when a court sustains a motion to quash, that court does not acquit the defendant of the charges brought against him. "[W]hen a motion to quash is sustained, the court may order that the defendant be held in custody or that his bail be continued for a specified time, pending the filing of a new indictment." La. C.Cr.P. art. 538.

In the present matter, when Judge Jasmine granted defendant's motion to quash, the State elected to dismiss the matter (*nolle prosequi*) and re-file a new indictment based upon the findings of the newly empaneled grand jury. The State has the power to dismiss an indictment without the consent of the court. La. C.Cr.P. art. 691. Such a dismissal does not bar a subsequent prosecution, subject to two exceptions[69] set forth pursuant to La. C.Cr.P. art. 693, which are

---

[69] The exceptions to the rule that dismissal of an indictment does not bar a subsequent prosecution are as follows:

84

inapplicable to the present matter. Thus, the State's pursuit of the new indictment, filed six days after the dismissal of the first indictment,[70] was consistent with the applicable law.

Moreover, the filing of the 2010 indictment did not violate the principles of double jeopardy and collateral estoppel because jeopardy did not attach after a *nolle prosequi* was entered. Jeopardy does not attach and there is no application of the constitutional prohibition until the defendant is "put to trial before the trier of the facts, whether the trier be a jury or a judge." *United States v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). In a jury trial, jeopardy attaches when the jury is empaneled and sworn. *Crist v. Bretz*, 437 U.S. 28, 36, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24 (1978). Here, the indictment was quashed prior to the empaneling and swearing in of the jury and prior to any testimony of witnesses.

Furthermore, although defendant claims that Judge Jasmine's ruling on his motion to quash resolved the merits of this case, thus barring "re-adjudication of a matter judicially settled," defendant's argument is misplaced. The ruling quashing the indictment was not based on a central issue, but rather was based solely on the court's finding that a member of the grand jury employed by the St. John the Baptist Parish Sheriff's Department participated in the proceedings "while wearing a shirt which openly advertised his employment with an office inherently aligned with the State." Since this matter was never considered on its merits and did not reach the critical stages required to place defendant in jeopardy, defendant's argument in this assignment is without merit.

---

(1) A dismissal entered without the defendant's consent after the first witness is sworn at the trial on the merits, shall operate as an acquittal and bar a subsequent prosecution for the charge dismissed; and

(2) A dismissal entered after a city court conviction has been appealed to the district court for a trial *de novo*, shall operate as an acquittal and bar a subsequent prosecution for the charge dismissed.

*See* La. C.Cr.P. art. 693.

[70] "[A] new prosecution for the same offense or for a lesser offense based on the same facts may be instituted within the time established by this Chapter or within six months from the date of dismissal, whichever is longer." La. C.Cr.P. art. 576.

Defendant also argues that Judge Jasmine had previously made a determination that the State's evidence, particularly the autopsy report, did not support a finding that defendant was guilty. Defendant, however, refers to a bond hearing that took place before Judge Jasmine after the first indictment and prior to the amended indictment, wherein Judge Jasmine heard testimony from Dr. Velva Boles, defendant's subsequently discredited expert witness, regarding her interpretation of the State's evidence at that point in the case, solely to determine the appropriate bond for defendants. This ruling in 2008 on the motion to set bond was in no way a determination of defendant's guilt or innocence, and thus has no *res judicata* effect.

This assignment of error is without merit.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, *State v. Oliveaux*, 312 So.2d 337 (La. 1975), and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). This review reveals no errors patent in this case.

## CONCLUSION

For the foregoing reasons, defendant's conviction and sentence are affirmed.

## AFFIRMED

86

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
ROBERT M. MURPHY
STEPHEN J. WINDHORST
HANS J. LILJEBERG

JUDGES



FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CHERYL Q. LANDRIEU
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **Uniform Rules - Court of Appeal, Rule 2-20** THIS DAY **MAY 26, 2016** TO THE TRIAL JUDGE, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_____
CHERYL Q. LANDRIEU
CLERK OF COURT

# 15-KA-339

### E-NOTIFIED

NO ATTORNEYS WERE ENOTIFIED

### MAILED

HON. JEFFREY M. LANDRY
ATTORNEY GENERAL
TERRI R. LACY
HEATHER HOOD
ASSISTANT ATTORNEYS GENERAL
LOUISIANA DEPARTMENT OF
JUSTICE
POST OFFICE BOX 94005
BATON ROUGE, LA 70804-9005

ERROL VICTOR, SR. #613100
IN PROPER PERSON
LOUISIANA STATE PENITENTIARY
ANGOLA, LA 70712